UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUN CAPITAL PARTNERS III, LP, SUN CAPITAL PARTNERS III QP, LP, and SUN CAPITAL PARTNERS IV, LP,<br><br>Plaintiffs/Counter-defendants,<br><br>vs.<br><br>NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND,<br><br>Defendant/Counter-plaintiff,<br><br>vs.<br><br>SCOTT BRASS HOLDING CORP. AND SUN SCOTT BRASS, LLC,<br><br>Third Party Defendants. | Civ. A. No. 10-10921 DPW<br><br>Hon. Douglas P. Woodlock, USDC (Presiding)<br>Hon. Marianne B. Bowler, USMJ |

**MEMORANDUM IN SUPPORT OF THE PLAINTIFFS' MOTION FOR PROTECTIVE ORDER REGARDING THE DEFENDANT'S NOTICES OF DEPOSITION FOR MARC J. LEDER AND RODGER R. KROUSE**

Theodore J. Folkman (BBO No. 647642)
MURPHY & KING, Professional Corporation
One Beacon St.
Boston, Massachusetts  02108
Telephone:  (617) 423-0400

Drew G.A. Peel*
Jeffrey S. Quinn*
Zubin P. Khambatta*
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:  (312) 862-2000

* Admitted *pro hac vice*

## I.   INTRODUCTION

Each of the plaintiffs moves for a protective order to quash the notices ("Notices") that defendant New England Teamsters & Trucking Industry Pension Fund ("NETTIPF") has served demanding the depositions of Messrs. Marc J. Leder and Rodger R. Krouse, (hereafter, the "Senior Executives"), who are co-founders and co-CEOs of Sun Capital Advisors, Inc. The Senior Executives should not be put to the trouble and expense of preparing and sitting for depositions in this lawsuit -- both because NETTIPF has not shown that the Senior Executives possess unique or superior personal knowledge of matters relevant to the claims and defenses at issue here, and because NETTIPF has failed to exhaust less burdensome discovery methods to obtain whatever relevant information it believes it can obtain by deposing the Senior Executives. For these and other reasons discussed below, the Court should issue a protective order quashing the Notices.

## II.   RELEVANT LEGAL STANDARDS

Courts properly are sensitive to the potential for abuse or harassment that depositions of the most senior executives (sometimes referred to as "apex depositions") can involve. Accordingly, in general two requirements must be met before courts will allow the depositions of very senior executives to go forward: (1) the executive in question must have personal knowledge of information that is relevant to the claims and defenses and that is superior or unique relative to the information available from other sources (the "Superior Knowledge Requirement"); and (2) less burdensome means of discovering the information being sought must first have been exhausted (the "Exhaustion Requirement"). *See, e.g., Zouroufie v. Lance, Inc.*, No. 07-2016-B/P, 2008 WL 1767729, at *2 (W.D. Tenn. Apr. 15, 2008) (denying CEO deposition where plaintiff "has not sufficiently demonstrated that [the CEO] has unique personal knowledge of the matters in this lawsuit . . . nor has he demonstrated that he has attempted to

first obtain this information through less burdensome means, such as by taking depositions of lower level employees . . . or through interrogatories"); *See also Reif v. CNA*, 248 F.R.D. 448, 451 (E.D. Pa. 2008) ("The courts which have decided this issue have focused their decisions on whether the executives' possess personal or superior unique knowledge. The courts also consider whether the information could be obtained from lower level employees or through less burdensome means, such as interrogatories."); *Simon v. Pronational Ins. Co.*, No. 07-60757, 2007 WL 4893478, at *1–2 (S.D. Fla. Dec. 13, 2007) (same); *Evans v. Allstate Ins. Co.*, 216 F.R.D. 515, 519 (N.D. Okla. 2003) (denying depositions of senior corporate officers where "the information can alternately be obtained from other sources without deposing these 'apex' officers"); *Harris v. Computer Assocs. Int'l, Inc.*, 204 F.R.D. 44, 46 (E.D.N.Y. 2001) ("When a vice president can contribute nothing more than a lower level employee, good cause is shown to not take the deposition."); *Filetech, S.A v. France Telecom, S.A.*, No. 95 CIV 1848(CSH), 1999 WL 92517, at *2 (S.D.N.Y. Feb. 17, 1999) (granting protective order against deposition of company chairman where "lesser France Telecom employees are available to furnish information" on the "narrow" matter at issue); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991) (granting protective order against deposition of Buick's top executive when other discovery devices such as interrogatories, depositions of lower level employees with knowledge of memorandum authored by executive, and corporate designee "have not yet been exhausted" and plaintiffs had not demonstrated that executive "has any superior or unique personal knowledge" of the issues); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985) (reversing magistrate's order allowing deposition of former Chairman, and in its place allowing interrogatories to be propounded).[1]

---

[1] In addition, the ABA's formally adopted civil discovery standards confirm that "[w]here information is being sought from an organization, counsel ordinarily should not seek in the first instance to take the deposition of the

The party seeking the deposition of a senior executive has the burden of showing that both the Superior Knowledge and the Exhaustion Requirements have been met. *See*, *e.g.*, *EchoStar Satellite, LLC v. Splash Media Partners, L.P.*, No. 07-cv-02611-PAB-BNB, 2009 WL 1328226, at *2 (D. Colo. May 11, 2009) ("Where . . . a party seeks to depose a high level executive removed from the daily subjects of the matter in litigation, the party seeking discovery" bears the burden of satisfying the apex deposition requirements. (internal citations and quotation marks omitted)); *Craig & Landreth, Inc. v. Mazda Motor of Am., Inc.*, No. 4:07-cv-134-SEB-WGH, 2009 WL 103650, at *2 (S.D. Ind. Jan. 12, 2009) (granting protective order to prevent deposition of Mazda's CEO because plaintiffs "made an insufficient showing" that the CEO had information material to the case).

In addition, where, as here, the senior executives whose depositions are being sought are ***not*** officers or executives of parties to the lawsuit, then establishing a party's entitlement to take such apex depositions becomes substantially more difficult. *See, e.g.*, *Blount Int'l, Ltd. v. Schuylkill Energy Resources Inc.*, 124 F.R.D. 523, 524-526 (D. Mass. 1989) (holding that discovery restrictions should be broader when non-party or its agents or employees are target of discovery; upholding magistrate's decision to grant a protective order limiting the scope of depositions of senior executives of non-party to the litigation).[2]

---

organization's senior management if someone else in the organization can be expected to have more direct and firsthand knowledge or information;" and further note: "[a] number of court decisions have held that it is improper to try to take the deposition of a company's or organization's senior executives if they are not the best persons within the organization to provide the information being sought." *See* ABA Civil Discovery Standards at 38, 40, August 2004.

[2] While plaintiffs (and Messrs. Leder and Krouse) could have insisted that NETTIPF subpoena Messrs. Leder and Krouse for deposition (as neither is an officer nor employee of any of the plaintiffs), to avoid further costs and unnecessary procedural disputes, plaintiffs (and Messrs. Leder & Krouse) have elected not to contest the improper procedural means by which NETTIPF has sought the depositions of Messrs. Leder and Krouse.

Moreover, where a party seeking the deposition of a senior executive fails to demonstrate that the party has satisfied both the Superior Knowledge and Exhaustion Requirements, then it is presumed that the sole purpose for such depositions is prohibited harassment, entitling the concerned senior executives to a protective order. *See Mulvey*, 106 F.R.D. at 366.

### III.   RELEVANT BACKGROUND

#### A.   Plaintiffs Are Passive Investment Funds, And The Senior Executives Are The Senior Officers Of Non-Party Sun Capital Advisors, Inc.

Plaintiff Sun Capital Partners III, LP ("SCP-III"), plaintiff Sun Capital Partners III QP, LP ("SCP-QP"), and plaintiff Sun Capital Partners IV, LP ("SCP-IV," or "Fund IV") -- collectively, the "plaintiffs"; individually, each a "plaintiff" -- are each passive private investment funds. None of the plaintiffs has any employees or officers, and the Senior Executives are therefore not employees or officers of any of the plaintiffs. (*See, e.g.*, Ex. 1, Calhoun Dep. Tr. 39:10-18.)

Fund III.   SCP-III and SCP-QP (collectively, "Fund III") are Delaware limited partnerships, and their general partner is Sun Capital Advisors III, LP (the "Fund III GP"). Pursuant to the limited partnership agreement for the Fund III GP, a "Limited Partner Committee" (the "Fund III GP-LPC") is invested with certain authorities and responsibilities, including decisions relating to the approval of investments by Fund III. The members of the Fund III GP-LPC have, at all relevant times, been the Senior Executives. (*See* Ex. 2, Klafter DX-5 (SCP-III LP Agmt.); Ex. 3, Klafter DX-6 (SCP-QP LP Agmt.); Ex. 4, Klafter DX-7 (Fund III GP Agmt.) § 4.1(a); Ex. 5, Klafter Dep. Tr. 58:2-59:4.)

Pursuant to a Master Advisory Agreement (among Sun Capital Advisors, Inc. ("SCAI"), the Fund III GP, and other entities), individuals employed by SCAI (*i.e.*, "deal teams") identify, analyze and present potential investment opportunities to the Fund III GP. Specifically, after a

deal team has identified and analyzed a particular investment opportunity, it will present it to the Fund III GP in a meeting involving the deal team and the Fund III GP-LPC. During this meeting, the Fund III GP-LPC decides whether to approve an investment by Fund III in the particular opportunity being presented (typically, a "portfolio company"), and if so, to what extent Fund III will invest in that opportunity. For example, the Fund III GP-LPC approved the Fund III investment in Sun Scott Brass, LLC ("SSB-LLC") in an amount sufficient to give Fund III a 30% ownership interest in SSB-LLC. (*See, e.g.*, Ex. 5, Klafter Dep. Tr. 49:9-51:5, 56:19-57:14; Ex. 6, [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto; Ex. 7 [SCP-III Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto.)

No minutes or other written records of such meetings of the Fund III GP, the deal teams and Fund III GP-LPC are taken or prepared in the ordinary course. (*See* Ex. 1, Calhoun Dep. Tr. 105:9-106:4.) And in fact, with respect to the investments at issue in this lawsuit, the Senior Executives have no independent recollection of the details regarding and the specific reasons for various decisions respecting the investments at issue in this lawsuit, although they have provided their best recollection of the general reasons for such decisions in connection with Fund III's responses to interrogatories recently propounded by NETTIPF. (*See* Ex. 6, [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto; Ex. 7 [SCP-III Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto.)

<u>Fund IV.</u>   SCP-IV ("Fund IV") is a Delaware limited partnership, and its general partner is Sun Capital Advisors IV, LP (the "Fund IV GP"). Pursuant to the limited partnership agreement for the Fund IV GP, a "Limited Partner Committee" (the "Fund IV GP-LPC") is invested with certain authorities and responsibilities, including decisions relating to the approval

of investments by Fund IV.  The members of the Fund IV GP-LPC have, at all relevant times, been the Senior Executives.  (*See* Ex. 8, Calhoun DX-11 (SCP-IV LP Agmt.); Ex. 9, Calhoun DX-14 (Fund IV GP Agmt.) § 4.1(a); Ex. 1, Calhoun Dep. Tr. 94:8-95:5.)

Pursuant to a Master Advisory Agreement (among SCAI, the Fund IV GP, and other entities), individuals employed by SCAI (*i.e.*, deal teams) identify, analyze and present potential investment opportunities to the Fund IV GP.  Specifically, after a deal team has identified and analyzed a particular investment opportunity, it will present it to the Fund IV GP in a meeting involving the deal team and the Fund IV GP-LPC.  During this meeting, the Fund IV GP-LPC decides whether to approve an investment by Fund IV in the particular opportunity being presented (typically, a portfolio company), and if so, to what extent Fund IV will invest in that opportunity.  For example, the Fund IV GP-LPC approved the Fund IV investment in SSB-LLC in an amount sufficient to give Fund IV a 70% ownership interest in SSB-LLC.  (Ex. 1, Calhoun Dep. Tr. 87:23-88:10, 92:18-93:15, 95:18-97:2. 105:17-23, 108:15-109:16; Ex. 10, [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto.)

No minutes or other written records of such meetings of the Fund IV GP, the deal teams, and Fund IV GP-LPC are taken or prepared in the ordinary course.  (Ex. 1, Calhoun Dep. Tr. 106:1-4.)  And in fact, with respect to the investments at issue in this lawsuit, the Senior Executives have no independent recollection of the details regarding and the specific reasons for various decisions respecting the investments at issue in this lawsuit, although they have provided their best recollection of the general reasons for such decisions in connection with Fund IV's responses to interrogatories recently propounded by NETTIPF.  (*See* Ex. 10, [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto.)

The Senior Executives.   While the Senior Executives are not officers or employees of any of the plaintiffs, they are the most senior executives and officers (*i.e.*, the Co-CEOs) of SCAI -- an investment advisory firm that provides consulting and other services to the Fund III GP, Fund IV GP, and other entities.  (Ex. 1, Calhoun Dep. Tr. 17:12-16.)

### B.     Scott Brass, Inc. Was Acquired In February 2007

In February 2007, Scott Brass Holding Corp. ("SBHC") acquired the stock of Scott Brass, Inc. ("SBI").  All of the voting stock of SBHC at the time was owned by SSB-LLC.  And SSB-LLC, in turn, was owned by both Fund III (which owned 30%) and Fund IV (which owned 70%).  (*See* Ex. 11, Calhoun DX-15 [SSB-LLC Agmt.]; Ex. 12, Calhoun DX-16 [Stock Purchase Agmt.])

SSB-LLC is one of six companies (collectively, the "Common Investments") that are owned by both Fund III and Fund IV and that NETTIPF claims should be at issue in this lawsuit. The six Common Investments are SSB-LLC, Sun Drivesol Worldwide, LLC ("Drivesol"), Sun Exopack, LLC ("Exopack"), Sun Indalex, LLC ("Indalex"), Sun Displays, LLC ("Displays"), and Sun Nova Friburgo, LLC ("Nova Friburgo").[3]  [Ex. 10, [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto.)

The reasons why the Fund III GP-LPC decided to invest in SSB-LLC an amount sufficient to give Fund III a 30% ownership interest in SSB-LLC, and the reasons why the Fund IV GP-LPC decided to invest in SSB-LLC an amount sufficient to give Fund IV a 70% ownership interest in SSB-LLC, are different and are set forth in responses to interrogatories that NETTIPF recently served.  Because the Fund IV GP-LPC decision to approve acquisition of

---

[3] Moreover, while Fund IV has invested in a handful of other companies in which Fund III also has invested (*i.e.*, Sun Capital Distribution Master, LLC, Sun Plumbing Finance III/Finance IV, LLC, Sun POP Finance, LLC, Sun Drivesol Finance, LLC, and Sun Sonneborn, LLC), none of these other companies owns a "controlling interest" (for purposes of applicable law and regulations) in any operating entities.

only a 70% ownership interest in SSB-LLC was based on the privileged advice of legal counsel, no further information can be provided regarding the reasons why Fund IV decided to acquire only a 70% interest in SSB-LLC. (*See* Ex. 10 [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto; Ex. 7 [SCP-III Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto; Ex. 6 [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Exs. A & B thereto.)

The Senior Executives' involvement in the initial identification and analysis of the SSB-LLC investment was minimal. The opportunity to acquire SBI was brought to the attention of SCAI employees by a third-party investment banker. The "deal team" for the SSB-LLC investment (comprised of SCAI employees) thereafter performed an initial screening analysis of the potential investment, conducted appropriate due diligence, undertook negotiations regarding terms of purchase, etc. (Ex. 1, K. Calhoun Dep. Tr. 90:15-93:8, 110:4-9, 175:7-23.)

Thus, the Senior Executives' knowledge of the SSB-LLC investment, and other Common Investments, is far more limited than (and inferior to) the knowledge of the deal team for each such Common Investment. (Ex. 1, K. Calhoun Dep. Tr. 175:7-23, 195:11-18, 196:10-19, 197:10-22.)

### C.  Discovery NETTIPF Has Taken (And Has Not Taken) Thus Far

<u>Initial Disclosures.</u>   Neither of the Senior Executives was disclosed in NETTIPF's Rule 26(a)(1) disclosures -- or plaintiffs' Rule 26(a)(1) disclosures -- as persons likely to have discoverable information. (*See* Ex. 13 (NETTIPF Disclosures); Ex. 14 (Plaintiffs' Disclosures))

<u>Depositions.</u>  To date, since fact discovery commenced in this case in September 2010, NETTIPF has taken three depositions: (1) a Rule 30(b)(6) deposition of a Fund IV representative (Kevin Calhoun); (2) a Rule 30(b)(6) deposition of a representative of SCP-III and SCP-QP (Melissa Klafter); and (3) a deposition of the former chief executive officer of SBHC and SBI

8

(Barry Golden).  (*See* Ex. 15 Calhoun DX-1; Ex. 16, Klafter DX-1; Ex. 17, Golden Dep. Notice.) In addition, pursuant to additional deposition notices and a subpoena that NETTIPF issued in late December 2010, NETTIPF will soon take three more depositions of fact witnesses: (1) M. Steven Liff; (2) Christopher Metz; and (3) Scott Edwards (as the representative of Sun Capital Partners, Inc. and Sun Capital Advisors, Inc.).  Notably, Mr. Liff was a member of the deal team for the Indalex investment and also a member of the deal team for the Scott Brass investment, while Mr. Edwards was a member of the deal team for the Exopack investment.  NETTIPF, however, has not sought the depositions of any members of the deal team for the Drivesol, Displays, or Nova Friburgo investment.  (*See* Ex. 18, [SCP-IV Resps. 1st Set Of Discovery Requests] at Resp. # 8 and Exhibit 4 thereto.)

Written Discovery.    To date, NETTIPF has served two rounds of written discovery. NETTIPF served the first round on or about November 3, 2010, addressing a separate set of document requests and interrogatories to each plaintiff.  Each plaintiff served its responses and objections to NETTIPF's first set of discovery requests on December 3, 2010.   Further, the exhibits to these responses and objections identified the members of each deal team for each of the Common Investments.  (*See* Ex 19, [SCP-QP Resps. To NETTIPF 1st Set of Discovery Reqs.] at Ex. 4 thereto;  Ex. 20, [SCP-III Resps. To NETTIPF 1st Set of Discovery Reqs.] at Ex. 4 thereto; Ex. 18, [SCP-IV Resps. To NETTIPF 1st Set of Discovery Reqs.] at Ex. 4 thereto.)

On or about December 23, 2010, NETTIPF served a second round of written discovery, this time addressing a single set of document requests and interrogatories to all three plaintiffs. Each plaintiff served its responses and objections to NETTIPF's fourth set of written discovery requests (identified inaccurately by NETTIPF as a "Second Set") on January 25, 2011.  (*See* Ex. 10 [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.]; Ex. 7 [SCP-III Resps. To

NETTIPF 2d Set of Discovery Reqs.]; Ex. 6 [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.])

Discovery Request No. 22 in NETTIPF's second round of discovery requests ("Discovery Request # 22") states:

> For each meeting of the Limited Partners [sic] Committee … of the General Partners of SCP III and SCP-QP and SCP-IV concerning the portfolio companies in which SCP III and SCP-QP, SCP-IV co-invested, state:
>
> a. The identity of the portfolio company that is the subject of the meeting;
>
> b. The date and location of the meeting;
>
> c. Identity of the persons who attended the meeting and their affiliation with Plaintiffs, if any;
>
> d. Summary of subjects discussed and decisions made regarding investments in each portfolio company.

On January 25, 2011, plaintiffs provided their responses (and objections) to the foregoing interrogatory (and NETTIPF's other requests and interrogatories). Further, the Senior Executives (and others) were consulted in preparing these responses, and thus, to the extent the Senior Executives could recall any of the requested information, they provided it. (*See id.*)

**D. NETTIPF's Assertions About The Allegedly Relevant Information Claimed To Be In The Possession Of The Senior Executives.**

NETTIPF claims in this case that the plaintiffs formed some sort of *de facto* joint venture or partnership to co-invest in SSB-LLC and the other Common Investments. (*See* Ex. 21, [12/22/10 Campbell Letter] at 2.)[4] NETTIPF further contends that because the Fund III GP-LPC

---

[4] If NETTIPF cannot establish the existence of a *de facto* joint venture or partnership between and among Fund III and Fund IV with respect to the SSB-LLC investment, then NETTIPF cannot establish that Fund III and IV are jointly and severally liable for the unmet pension funding obligations that SBI incurred when it ceased operations and withdrew from NETTIPF in the fall of 2008. Therefore, plaintiffs believe that the SSB-LLC investment is the only one that is relevant in this lawsuit, but even if any of the other Common Investments is deemed relevant to the

10

and Fund IV GP-LPC approved each of the Common Investments at meetings with each of the deal teams for each of the Common Investments, and because the Senior Executives are the members of the Fund III GP-LPC and the Fund IV GP-LPC, NETTIPF needs to depose the Senior Executives respecting the meetings at which each of the Common Investments was approved. (*See id*. at 2.)

Specifically, NETTIPF claims that it is entitled to depose the Senior Executives to procure information regarding meetings of the Fund III GP-LPC, Fund IV GP-LPC, and deal teams for each of the Common Investments during which decisions were made regarding whether to invest in a particular portfolio company, and, if so, to what extent to invest (the "NETTIPF Deposition Topics"). Moreover, while acknowledging that deal team members for each of the Common Investments would have knowledge of the reasons and bases for the decision to invest (and to what extent to invest) for each of the Common Investments, NETTIPF nevertheless claims that it should be allowed to depose the Senior Executives because they were the only individuals who attended each of the meetings of the Fund III GP-LPC and the Fund IV GP-LPC where decisions were made with respect to each of the Common Investments. (*See id*. at 2.)

By letter dated January 5, 2011, plaintiffs objected to NETTIPF's deposition notices for the Senior Executives as unnecessary and harassing. Plaintiffs noted that members of the deal team also could provide information about the referenced meetings and decisions and that the response to NETTIPF's Discovery Request No. 22 would include all relevant information in the possession of the Senior Executives (if any) respecting meetings involving the decisions to

---

claims and defenses at issue in this lawsuit (and it should not be), the SSB-LLC investment plainly remains the most relevant (and therefore most important) one for purposes of discovery.

acquire the Common Investments. Plaintiffs also offered to meet-and-confer further on this issue. (*See* Ex. 22, [1/5/11 Peel Letter] at 2.)

Such a meet-and-confer occurred between plaintiffs' counsel and NETTIPF's counsel on January 10, 2011 via telephonic conference. Counsel of record for NETTIPF, Cathy M. Campbell and Renee J. Bushey, and counsel of record for plaintiffs, Drew G.A. Peel and Zubin P. Khambatta, participated from their offices in Boston and Chicago, respectively. At this meeting counsel discussed various discovery disputes that are not the subject of this motion, including the manner in which plaintiffs' document productions as of that date were produced, the available dates for deposing M. Steven Liff and Chris Metz, and objections to the deposition subpoena of a representative of SCAI. At the discovery conference or in the days that followed, the plaintiffs agreed to provide the Bates numbers of each document produced as of the date of the discovery conference, a brief description of the document, an indication when appropriate of whether the document was a final version or draft, and an identification of which of the parties produced the document. In addition, the parties agreed on the dates for deposing Messrs. Liff and Metz, SCAI agreed to make available for deposition Scott Edwards as its Rule 30(b)(6) representative, and SCAI and NETTIPF agreed on the subjects on which Mr. Edwards would be examined. However, NETTIPF's counsel asserted at the January 10, 2011 discovery conference and has continued to assert that the depositions of the Senior Executives are warranted, thereby necessitating the filing of this motion. During the meet-and-confer and subsequently plaintiffs' counsel informed that this motion would be filed because of NETTIPF's continued insistence on taking the depositions of the Senior Executives.

## IV.  ARGUMENT

**A.  A Motion For Protective Order Is Proper In Cases Like This One.**

12

The Court has authority pursuant to Rules 26(b)(2)(C) and 26(c) of the Federal Rules of Civil Procedure to quash the notices of deposition that plaintiffs have served for the Senior Executives. *See, e.g.*, *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 249 F.R.D. 8, 11-15 (D. Mass. 2008) (granting protective order under Rule 26(b)(2)(C)); *Reif*, 248 F.R.D. at 451-54 (quashing the deposition of CEO of defendants because of discovery limitations provided by Rule 26(b)(2)). Such relief is appropriately awarded in cases like this one. *See, e.g.*, *Reif*, 248 F.R.D. at 451-54; *Computer Assocs.*, 204 F.R.D. at 46-47; *Baine*, 141 F.R.D. at 335.

>    **B.     NETTIPF Cannot Satisfy The Superior Knowledge Requirement.**

For at least two reasons, NETTIPF cannot establish that the Senior Executives have unique or superior knowledge that is relevant to the claim and defenses at issue this lawsuit.

*First*, other individuals -- *e.g.*, members of each deal team -- have knowledge superior to that of the Senior Executives regarding the SSB-LLC investment and other Common Investments.  (*See* Ex. 1, Calhoun Dep. Tr. 195: 8-18, 196:10-19, 198:2-22.)  As a result, NETTIPF cannot satisfy the Superior Knowledge Requirement here, entitling plaintiffs to a protective order quashing the deposition notices for each of the Senior Executives. *See, e.g.*, *Zouroufie*, 2008 WL 1767729, at *2 (granting protective order to quash deposition of defendant's CEO when he did not have greater knowledge of relevant facts than the company's Rule 30b(6) representative; plaintiff "has not sufficiently demonstrated that [CEO] has unique personal knowledge of the matters in this lawsuit to justify taking his deposition); *Baine*, 141 F.R.D. at 335 (granting protective order when plaintiffs sought to depose executive who authored memorandum on safety restraint system but failed to depose any of 18 distributees, defendant's Rule 30(b)(6) designee, or propound appropriate interrogatories; plaintiffs have not

"demonstrated that Mr. Mertz has any superior or unique personal knowledge of the restraint system or of the accident which led to the plaintiffs' decedent's death").

***Second***, NETTIPF cannot demonstrate the unique or superior personal knowledge of the Senior Executives when plaintiffs have already provided all of the relevant information about NETTIPF's Deposition Topics these individuals know.  In the responses to Document Request No. 22 of NETTIPF's second set of discovery requests, each plaintiff stated to the best of its ability what -- based on its knowledge and belief and given the limited recollections of SCAI employees and that contemporaneous minutes or other records were nor prepared in the ordinary course -- is the estimated date, likely location, likely attendees, and likely subjects discussed and decisions made at the meetings where the decision was to invest in each of the six Common Investments was made by the Fund III GP-LPC and by the Fund IV GP-LPC.  (*See* Ex. 10 [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. A thereto; Ex. 7 [SCP-III Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. A thereto; Ex. 6 [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. A thereto.)  In addition, subject to withholding privileged information, each plaintiff stated to the best of its ability what -- based on its knowledge and belief and given the limited recollections of SCAI employees and that contemporaneous minutes or other records were nor prepared in the ordinary course -- is the explanation of the reasons it made the investment in the six Common Investments and the reasons it invested to the extent it did.  (*See* Ex. 10 [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. B thereto; Ex. 7 [SCP-III Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. B thereto; Ex. 6 [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. B thereto.)  Moreover, the Fund IV GP-LPC's decision to approve investment of an amount sufficient only to own 70% of SSB-LLC and 70% of Sun

Displays, LLC was based on the advice of legal counsel, and therefore neither of the Senior Executives (and none of the deal team members) can or will provide further details respecting the privileged advice of legal counsel on which that decision was based.  (*See* Ex. 10 [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resp. #22 & Ex. B thereto.)

Each plaintiff's response to this interrogatory, furthermore, reflected the input of the Senior Executives, among other persons, was based on the review of contemporaneous documents and is, to each plaintiff's knowledge and belief, true and accurate.  (*See* Ex. 10 [SCP-IV Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resps. #1 and #22; Ex. 7 [SCP-III Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resps. #1 and #22; Ex. 6 [SCP-QP Resps. To NETTIPF 2d Set of Discovery Reqs.] at Resps. #1 and #22.)  In short, the personal knowledge of each of the Senior Executives on NETTIPF's Deposition Topics has been exhausted in these responses.  For this reason alone, therefore, NETTIPF cannot satisfy the Superior Knowledge Requirement and plaintiffs are entitled to a protective order quashing the deposition notices for each of the Senior Executives.  *See, e.g.*, *Conti v. Am. Axle and Mfg., Inc.*, No. 05-72335, 2007 WL 850998, at *2 (E.D. Mich. March 16, 2007) (citing *Community Federal Sav. & Loan Assn. v. Federal Home Loan Bank Board*, 96 F.R.D. 619, 621-22 (D.C.  1983)) ("[A] party seeking the deposition of a high level decision-maker who is removed from the daily subjects of the litigation must first demonstrate that the individual has 'unique personal knowledge' of the matter; the deposition would not be permitted where the information could be obtained through interrogatories . . . ."); *Evans*, 216 F.R.D. at 519 (quashing depositions of apex officers when defendant "had already provided adequate information" in discovery).

**C.    NETTIPF Also Cannot Satisfy The Exhaustion Requirement.**

Even if NETTIPF could satisfy the Superior Knowledge Requirement here (and it cannot), it cannot establish that it has satisfied the Exhaustion Requirement for several reasons.

15

***First***, plaintiffs already have provided all of the relevant, non-privileged information that the Senior Executives can specifically recall or otherwise possess about the NETTIPF Deposition Topics in their responses to Discovery Request #22 and in the deposition testimony of the designated representatives produced on behalf of each plaintiff, and NETTIPF has not yet taken (or even sought to take) the depositions of lower-level officers or employees who were members of each of the deal teams for the Common Investments. Thus, the failure to depose at least one member of each of the deal teams for each of the six Common Investments -- before burdening the Senior Executives with such a deposition -- establishes NETTIPF's inability to meet the Exhaustion Requirement. *See, e.g., Zouroufie*, 2008 WL 1767729, at *2 (granting protective order to quash apex deposition when plaintiff did not attempt to obtain through lower level depositions the information sought from the senior executive in question); *Conti*, 2007 WL 850998, at *2 ("A court may require that plaintiff depose other employees with allegedly more knowledge of the facts [than] the corporate president before deposing him."); *Baine*, 141 F.R.D. at 335-36 (quashing deposition of senior executive and ordering plaintiffs to obtain discovery through less burdensome means, including depositions of lower level employees with knowledge of those subjects that provided rationale for seeking apex deposition).

***Second***, plaintiffs could have noticed -- but did not notice -- additional Rule 30(b)(6) depositions, requesting the production of representatives to testify on behalf of each plaintiff regarding the decisions by each of the Fund III GP-LPC and the Fund IV GP-LPC to undertake each of the Common Investments. Instead, however, plaintiffs served a single Rule 30(b)(6) notice on each of the plaintiffs, asking each plaintiff to prepare and produced a witness to address some 17 different topics -- none of which specifically requested information regarding decisions made by the Fund III GP-LPC or the Fund IV GP-LPC. (See Ex. 15 Calhoun DX-1;

Ex. 16, Klafter DX-1)  This too demonstrates NETTIPF's failure to meet the Exhaustion Requirement.  *See, e.g.*, *Zouroufie*, 2008 WL 1767729, at *2 (potential testimony of Rule 30(b)(6) witness is reason to quash deposition of senior executive); *Reif*, 248 F.R.D. at 454 (same); *Baine*, 141 F.R.D. at 336 (same).

***Third***, NETTIPF did not exhaust the knowledge of the witnesses that were prepared and produced to testify on behalf of Fund IV and Fund III in response to NETTIPF's first set of Rule 30(b)(6) notices.  Specifically, when the Fund IV representative (Mr. Calhoun) testified that one of the bases for deciding to what extent to invest is capital availability, (Ex. 1, Calhoun Dep. Tr. 169:14-172:6; 196:22-197:9), NETTIPF's counsel could have -- but failed to -- ask him the reasons why Fund IV invested to the extent it did in each of the six Common Investments.  The same is true for the deposition of the Fund III representative (Ms. Klafter) after she provided substantially the same testimony.  (*See* Ex. 5, Klafter Dep. Tr. 126:11-128:8)  In addition, although Mr. Calhoun testified that investments by Fund IV in a 50% ownership interest likely were the result of a general decision that persons besides the Senior Executives would know about (Ex. 1, Calhoun Dep. Tr. 191:11-192:5; 192:16-193:3), NETTIPF's counsel failed to ask him to identify the persons with such knowledge.  NETTIPF also failed to ask Ms. Klafter about how the ownership percentages of Fund III were determined for each of the Six Common Investments when she testified that these determinations depend on the facts and circumstances of each such transaction.  (Ex. 5, Klafter Dep. Tr. 51:8-52:4)  And once again, this confirms that NETTIPF cannot satisfy the Exhaustion Requirement here.  *See, e.g.*, *Reif*, 248 F.R.D. at 453-54 (quashing deposition of defendants' CEO when plaintiffs did not attempt to obtain from lower level deponents the information they assert is sufficient rationale for apex deposition).

## V.  CONCLUSION

For each of the foregoing reasons, plaintiffs respectfully request that their motion for protective order to quash the deposition notices of Marc Leder and Rodger Krouse be granted.

Dated:  January 26, 2011

Respectfully submitted,

SUN CAPITAL PARTNERS III, LP,
SUN CAPITAL PARTNERS III QP, LP, and
SUN CAPITAL PARTNERS IV, LP

By their attorneys:

/s/ Drew G.A. Peel

Theodore J. Folkman (BBO No. 647642)
MURPHY & KING, Professional Corporation
One Beacon St.
Boston, Massachusetts  02108
Telephone:  (617) 423-0400
tjf@murphyking.com

Drew G.A. Peel*
Jeffrey S. Quinn*
Zubin P. Khambatta*
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
drew.peel@kirkland.com
jeffrey.quinn@kirkland.com
zubin.khambatta@kirkland.com

* Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 26, 2011.

/s/ Theodore J. Folkman