UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| SUN CAPITAL PARTNERS III, LP, SUN CAPITAL PARTNERS III QP, LP, and SUN CAPITAL PARTNERS IV, LP, | ) ) ) |
| | ) |
|        Plaintiffs/ Counter-Defendants, | ) ) |
| | ) |
| v. | ) |
| | ) |
| NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND, | ) ) |
| | ) |
|        Defendant/ Counter-Plaintiff. | ) ) |
| | ) |

CIVIL ACTION NO.
10-10921-DPW

MEMORANDUM AND ORDER
October 18, 2012

Sun Capital Partners III, LP and Sun Capital Partners III QP, LP (together, "Sun Fund III"), and Sun Capital Partners IV, LP ("Sun Fund IV") (collectively, the "Sun Funds"), seek a declaratory judgment that they are not liable to New England Teamsters and Trucking Industry Pension Fund (the "Pension Fund") for the payment of withdrawal liability stemming from the bankruptcy of Scott Brass, Inc., one of the companies in which the Sun Funds invested.

The Sun Funds moved for summary judgment, asserting that they are not "trades or businesses" under ERISA and the investment transactions were not structured with the primary purpose of "evading or avoiding" withdrawal liability. The Pension Fund opposed the Sun Funds' motion and filed a cross-motion for summary judgment, seeking a declaration that the Funds

are jointly and severally liable for payment of Scott Brass, Inc.'s withdrawal liability.  I have granted the motion of the Sun Funds and denied that of the Pension Fund. This memorandum provides the extended explanation of the reasons judgment shall enter for the Sun Funds.

## I.   BACKGROUND

A.   Withdrawal Liability

The Pension Fund seeks to recover approximately $4.5 million in "withdrawal liability" incurred by Scott Brass, Inc., under a collective bargaining agreement, when it went bankrupt and withdrew from the pension plan.  When an employer withdraws from a multiemployer pension plan, the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") requires that the employer pay the pension plan a sum sufficient to cover the employer's fair share of the pension's unfunded liabilities, "that is, the difference between the present value of vested benefits . . . and the current value of the plan's assets." *Concrete Pipe & Prods. of Cal., Inc.* v. *Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 609 (1993) (quotations and citations omitted).  That sum is the employer's "withdrawal liability."

B.   Facts

*I.   The Sun Funds*

Sun Capital Advisors, Inc. is a private investment firm founded by Marc Leder and Rodger Krouse specializing in leveraged

2

buyouts and other investments in underperforming, market-leading companies.  It provides investment advice to Sun Capital investment funds, two of which are the plaintiffs in this action, Sun Fund III[1] and Sun Fund IV.  Sun Capital Advisors finds and recommends investment opportunities for the Sun Funds, then negotiates, structures, and finalizes the investment deals. Sun Capital Advisors also collects fees pursuant to management services agreements both from the Sun Funds and from the companies in which the Sun Funds invest on Sun Capital Advisor's recommendations.

Sun Fund III and Sun Fund IV are two of Sun Capital Advisors' investment funds.  Each is a limited partnership, to which individuals and institutional investors contribute capital for investment purposes.  Neither has any employees, owns any office space, or makes or sells any goods.  They are simply pools of investment capital managed by a general partner.

The general partner oversees the fund's investment activities in return for a fee and a "carried interest" portion of the Fund's investment profits.  The Sun Funds' limited

---

[1]  Sun Fund III is actually two different funds, Sun Capital Partners III, LP and Sun Capital Partners III QP, LP.  Sun Capital Partners III, LP and Sun Capital Partners III QP, LP, are "parallel funds" run by one general partner and generally make the same investments in the same proportions.  For clarity, I consider them together in this Memorandum as one fund, which I refer to as Sun Fund III.

partnership agreements have identical language concerning the powers of their general partners:

> 6.1.  <u>Management Authority.</u>
>
> (a)  The management of the Partnership shall be vested exclusively in the General Partner, and the General Partner shall have full control over the business and affairs of the Partnership. The General Partner shall have the power on behalf and in the name of the Partnership to carry out any and all of the objectives and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which the General Partner, in its sole discretion, deems necessary or advisable or incidental thereto, including the power to acquire and dispose of any security (including marketable securities).
>
> (b)  All matters concerning (i) the allocation and distribution of net profits, net losses, Investment Proceeds, Short-Term Investment Income, and the return of capital among the Partners, including the taxes thereon, and (ii) accounting procedures and determinations, estimates of the amount of Management Fees payable by any Defaulting Partner or Regulated Partner, tax determinations and elections, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the General Partner in good faith and in a manner not inconsistent with this Agreement, whose determination shall be final and conclusive as to all the Partners absent manifest error.
>
> (c)  Third parties dealing with the Partnership can rely conclusively upon the General Partner's certification that it is acting on behalf of the Partnership and that its acts are authorized. The General Partner's execution of any agreement on behalf of the Partnership is sufficient to bind the Partnership for all purposes.

Sun Fund III's general partner is Sun Capital Advisors III, LP, and Sun Fund IV's general partner is Sun Capital Advisors IV,

LP.  Each general partner has a limited partner committee that makes investment decisions for the Fund.  The general partners' limited partnership agreements states that:

> Except as otherwise expressly provided in this Agreement, *all material Partnership decisions and determinations will be made by the Limited Partner Committee* established under Article VI, including all Partnership decisions and determinations relating to (a) the acquisition of Fund investments, (b) the disposition of Fund investments, (c) distributions by the Fund of cash and/or securities, (d) amendments to the Fund Agreement, (e) distributions of Partnership cash and securities, (f) distributions of cash and securities from escrow accounts, (g) the borrowing of money, (h) hiring, terminating and establishing the compensation of employees and agents of the Fund or Portfolio Companies and (I) the incurring of expenses on behalf of the Partnership.  The Partnership may (I) appoint such officers or employ such Persons on behalf of the Partnership, who may but need not be Active Limited Partners, to carry out such terms and to perform such functions as the Limited Partner Committee shall determine, (ii) appoint or otherwise contract with such other Persons for the transaction of the business of the Partnership or the performance of services for or on behalf of the Partnership as the Limited Partner Committee shall determine and (iii) delegate to any such officer or Person such authority to act on behalf of the Partnership as the Limited Partner Committee may from time to time deem appropriate.  Each Founding Partner is hereby appointed as a "Managing Director" of the Partnership (in each case, only so long as such Person is an Active Partner) and shall have, in such capacity, the powers and duties granted to them by the Limited Partner Committee.

Leder and Krouse, the founders of Sun Capital Advisors, Inc., are the sole members of the limited partner committees of the general partners of both Sun Fund III and Sun Fund IV.  In turn, Sun Capital Advisors III, LP (the general partner of Sun Fund III) also has a general partner, Sun Capital Partners III,

LLC.  Likewise, Sun Capital Advisors IV, LP (the general partner of Sun Fund IV) has a general partner, Sun Capital Partners IV, LLC.

Each of the Sun Funds' general partners also has a management company, Sun Capital Partners Management III, LLC and Sun Capital Partners Management IV, LLC respectively.  The management companies of the general partners provide managerial and consulting services to the holding companies in which the Funds invest.  In essence, the management companies act as middle-men, providing the companies in which the Sun Funds invest with employees and consultants from Sun Capital Advisors.  The management companies also collect the consulting and management fees earned.

*ii.  The Investment*

In 2006, Sun Capital Advisors brought Scott Brass, Inc., a manufacturer of brass and copper coil for industrial purposes, to the attention of the Sun Funds' general partners as a potential investment opportunity.  The Sun Funds created a Delaware limited liability corporation named Sun Scott Brass, LLC to act as an investment vehicle.  Acting as the limited partner committee of the Sun Funds' general partners, Leder and Krouse authorized Sun Fund IV to invest $2.1 million in Sun Scott Brass, LLC, in exchange for 70% ownership of its membership interests, and also

authorized Sun Fund III to invest $900,000 in exchange for the remaining 30%.

Sun Scott Brass, LLC, then invested that $3 million in a holding corporation, Scott Brass Holding Corp., in exchange for $1 million in Scott Brass Holding Corp. stock and $2 million in debt.  Scott Brass Holding Corp. then purchased all of the stock in Scott Brass, Inc. with this $3 million in cash and an additional $4.8 million it borrowed.

*iii. Bankruptcy and the Pension Fund*

At the time of purchase in 2006, Scott Brass, Inc. was regularly making its payments into the Pension Fund, and continued to do so over the next two years.  However, in the fall of 2008 the price of copper declined, and Scott Brass, Inc. was unable to obtain credit to stay in business.

In October 2008, Scott Brass, Inc. withdrew from the Pension Fund and, on November 21, 2008, entered into bankruptcy.  On December 19, 2008, the Pension Fund demanded Scott Brass, Inc. pay its withdrawal liability in the amount of $4,516,539.  Upon further investigation, the Pension Fund asserted that Sun Fund III and Sun Fund IV had entered into a joint venture or partnership in common control with Scott Brass, Inc., and were therefore jointly and severally liable for Scott Brass, Inc.'s withdrawal liability. Consequently, the Pension Fund demanded payment from the Sun Funds as well.

C.    Procedural History

Sun Funds III and IV filed this lawsuit in June 2010 seeking a declaration that each was not an "employer" under 29 U.S.C. § 1301(b)(1) that could be held liable for Scott Brass, Inc.'s withdrawal liability, because neither was (1) a "trade or business," or (2) under "common control" with Scott Brass, Inc.

The Pension Fund filed a counterclaim alleging that the Sun Funds were jointly and severally liable for Scott Brass, Inc.'s withdrawal liability under § 1301.  It also claimed that the "principal purpose" of the Sun Funds' decision to split their investments up 70% and 30% was to "evade or avoid" withdrawal liability, in violation of 29 U.S.C. § 1392(c).

In an order on September 3, 2010, I granted the Sun Funds' Partial Motion for Judgment on the Pleadings, Dkt. No. 19, finding that the question of whether the Sun Funds were "employers" under ERISA was a legal issue to be decided by the court, and not subject to ERISA's arbitration provision.  The parties then structured the case for resolution on the cross-motions for summary judgment now before me.

## II.    STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that

a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).  In dealing with cross-motions for summary judgment, I "must view each motion, separately, through this prism." *Estate of Hevia* v. *Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

### III.  DISCUSSION

#### A.  Legal Background

Congress enacted the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), to ensure that private-sector employees would receive the pensions they had been promised by their employers. *Milwaukee Brewery Workers' Pension Plan* v. *Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). ERISA set minimum funding standards for employers in order to meet future vested pension liabilities, mandated termination

9

insurance to protect employees in event of pension bankruptcy, and made withdrawing employers liable for a fair share of a plan's deficits if the pension plan became insolvent during the first five years after withdrawal.

The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461, was enacted to solve an unintentional side-effect of ERISA's regulations.  In the pre-1980 regime, by only requiring withdrawing employers to pay a sum if the pension plan became insolvent after withdrawal, ERISA incentivized employers to withdraw from pension plans at the first sign of a plan's financial instability.  When withdrawing early, an employer's risk was limited to paying its fair share if the plan became insolvent.  If, however, an employer remained in a financially unstable pension plan, it ran the risk that other employers would leave and it would be left paying the entire pension by itself. Thus, before the enactment of the MPPAA, a pension plan's "financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417; *see, e.g.*, 29 U.S.C. § 1001a(a)(4) ("[W]ithdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations, and . . . in a declining

industry, the incidence of employer withdrawals is higher and the adverse effects described [above] are exacerbated.").

The MPPAA amended ERISA to require withdrawing employers to pay their fair share of the pension plan's unfunded liabilities. This changed the cost-benefit calculus for employers because the MPPAA turned into a guarantee what previously was only a risk of responsibility for the employer's fair share of the pension's unfunded liabilities upon withdrawal. *See* H.R. Rep. No. 869, 96th Cong., 2d Sess., 67, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2918, 2935 (stating that the purpose of uniform withdrawal liability was to "relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.").

Under the MPPAA, members of a common controlled group are jointly and severally liable for the withdrawal liability of an employer so that employers cannot avoid liability by splintering into separate entities.  Under § 1301, "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."  29 U.S.C. § 1301(b)(1).  Thus, for another entity to be liable for the withdrawal liabilities of the employer, it must be (1) a

"trade or business," and (2) under "common control" with the employer.  *Id.*

B.   Statutory Liability Analysis

The Sun Funds allege that they are passive investors whose only income is investment income from dividends and capital gains.  This, they argue, is insufficient to constitute a "trade or business" for purposes of § 1301, and they therefore cannot be on the hook for Scott Brass, Inc.'s withdrawal liability.

The Pension Fund disagrees, arguing that the Sun Funds' income and activity is not limited to passive investment.  The Pension Fund relies on an opinion by the Appeals Board of the Pension Benefit Guaranty Corporation ("PBGC") which held in a similar context that a private equity firm was engaged in a "trade or business" for purposes of § 1301 liability.

1.   *Defining "Trade or Business"*

ERISA and the MPPAA do not define "trade or business," but rather direct courts to look to the tax code and tax caselaw to interpret such terms.  29 U.S.C. § 1301(b) (requiring that regulations pursuant to this section be "consistent and coextensive with" regulations under the Tax Code); *see also*, *Central States, Se. & Sw. Pension Fund* v. *Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001).  In 1941, the Supreme Court held that an individual with extensive investments, who devoted a considerable portion of his time to managing them, hired others

12

to assist him in managing them, and rented offices for those
helping him, was not engaged in a "business" as a matter of law,
"[n]o matter how large the estate or how continuous or extended
the work required may be." *Higgins* v. *Comm'r*, 312 U.S. 212, 218
(1941).  Then, in 1963, the Supreme Court held that:

> Devoting one's time and energies to the affairs of a
> corporation is not of itself, and without more, a trade
> or business of the person so engaged.  Though such
> activities may produce income, profit or gain in the
> form of dividends or enhancement in the value of an
> investment, this return is distinctive to the process
> of investing and is generated by the successful
> operation of the corporation's business as
> distinguished from the trade or business of the
> taxpayer himself.  *When the only return is that of an
> investor, the taxpayer has not satisfied his burden of
> demonstrating that he is engaged in a trade or business
> since investing is not a trade or business* and the
> return to the taxpayer, though substantially the
> product of his services, legally arises not from his
> own trade or business but from that of the corporation.

*Whipple* v. *Comm'r*, 373 U.S. 193, 202 (1963) (emphasis added).

Most recently, in *Commissioner v. Groetzinger*, the Supreme
Court established a test for when an activity constitutes a trade
or business.  *See* 480 U.S. 23, 35 (1987).  Under *Groetzinger*, for
a person to be engaged in a trade or business, (1) the primary
purpose of the activity must be income or profit, and (2) the
activity must be performed with continuity and regularity.  *Id.*
It is generally accepted that *Higgins* and *Whipple* remain good
law, and their caution that investments are not trades or
businesses survives *Groetzinger*.  *See, e.g., Fulkerson,* 238 F.3d
at 895 ("One purpose of the *Groetzinger* test is to distinguish

13

trades or business from investments, which are not trades or business and thus cannot form a basis for imputing withdrawal liability under § 1301(b)(1)."); *see also id.* at 896 ("Given the prevalence of investing, permitting the holding of investments (which will normally satisfy the first prong of *Groetzinger* since the purpose is to produce income) without more to be considered regular and continuous activity would eviscerate the limitations placed on the text of § 1301(b)(1).").

In 2007, however, the PBGC Appeals Board released an opinion holding, in an informal adjudication, that a private equity fund in a factual situation similar to that presented here qualified as a "trade or business" for purposes of § 1301.  The PBGC Appeals Board applied the *Groetzinger* test, and found that both prongs were met.  The first prong was said to be met because the stated purpose of the fund was to make a profit, the fund's partnership tax returns stated that the fund was engaged in "investment services," and the general partner of the fund received compensation in the form of consulting fees, management fees, and carried interest, not just through investment income. *PBGC* at 11.  The Appeals Board held that the second prong was met because, although it had no evidence of the length of time the general partner devoted to managing the private equity fund's portfolio, the size of the fund's overall portfolio (approximately $470 million) and the profits generated therefrom

14

($207,000 in investment income and $7 million in management fees) were sufficient to evidence continuity and regularity.  *Id.*

The Appeals Board purported to distinguish the holdings in *Higgins* and *Whipple* that investment activities do not constitute a trade or business.  It characterized the holdings in both cases as being limited to personal investments and individuals, not partnerships like a private equity fund.  *Id.* at 12. Specifically, the Appeals Board held,

> The Fund, unlike the taxpayer in *Higgins*, is not:  (1) an individual acting on his own behalf; (2) merely keeping records and collecting dividends and interest from investments; and (3) solely receiving a return as an [sic] passive investor.  Instead, the Fund is a "trade or business" because it regularly is involved in investment activities of a much more active nature than those in *Higgins*.  This is reflected in the responsibilities of its agent . . . who:  (I) provides investment advisory and management services to others (i.e., its partners); (ii) hires a third-party . . . to assist in selecting and purchasing potential investments . . . and in distributing the net profits and losses from these companies to itself and limited partners; and (iii) receive compensation for such services (e.g., 20% of all realized profits from the Fund's investments).
>
> . . .
>
> The facts in *Whipple* are distinguishable because the Fund, as evidenced by its tax returns and Partnership Agreement, was directly and substantially involved in a recognized business activity (i.e., providing investment advisory and management services) for the benefit of several other entities (i.e., its general and limited partners). . . .  Furthermore, in contrast to the taxpayer in *Whipple*, . . . the Fund's agent was entitled to compensation for investment advisory and management services it performed.

*Id.* at 12-13.

15

2.    *Deference to the PBGC Appeals Board*

The parties disagree about how much deference I owe the 2007 PBGC Appeals Board opinion.  Ordinarily, as the agency responsible for interpreting the MPPAA and enacting regulations pursuant thereto, the PGBC would be entitled to substantial deference when it construes the statute.  *See United States* v. *Rutherford*, 442 U.S. 544, 553 (1979) ("As this Court has often recognized, the construction of a statute by those charged with its administration is entitled to substantial deference.")  But the deference extends only as far as the statutory grant, and here that grant extends only to regulations "consistent and coextensive" with Tax Code regulations.  *See* 29 U.S.C. § 1301(a)(14)(B) ("[T]he determination of whether two or more persons are under 'common control' shall be made under regulations of the [PBGC] which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of Title 26 . . . .").  Moreover, "interpretations contained in formats such as opinion letters are entitled to respect . . . only to the extent that those interpretations have the power to persuade." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) (citation and internal quotation marks omitted).  Thus, the 2007 PBGC Appeals Board opinion, which takes the form of an opinion

letter, will be given deference only to the degree it is persuasive.

I find the Appeals Board opinion unpersuasive.  First, it misunderstood the law of agency in determining whether the private equity firm in that case was a "trade or business" for purposes of the statute.  Second, it misread Supreme Court precedent.

The Appeals Board incorrectly attributed the activity of the general partner to the investment fund.  The trade or business of an agent does not transfer to the principal.  For example, a real estate broker is an agent for an individual looking to sell his home, but the homeowner is not therefore engaged in the broker's trade or business by fact of their relationship.  *See, e.g.*, *Reynolds* v. *Comm'r*, 1945 WL 7104 (T.C. 1945) ("We do not agree that the owner of property placed with an agent for sale is thereby engaged in the same business as the agent.").  Thus, the Appeals Board's misapplication of agency law in its "trade or business" analysis is unpersuasive, in error, and not entitled to deference.

More fundamentally, there is no basis for the Appeals Board's interpretation of *Higgins* and *Whipple* as limited to individuals and not partnerships.  In fact, courts have cited to *Higgins* and *Whipple* in determining that a partnership was not engaged in a "trade or business" when it invested research

funding into a startup.  *See, e.g.*, *LDL Research & Dev. II, Ltd.*
v. *Comm'r*, 124 F.3d 1338, 1344 (10th Cir. 1997) (reiterating that
"[m]anaging investments, no matter how time-consuming or
lucrative, does not constitute a trade or business.").  The IRS's
own Technical Advice Memoranda on the subject notes, in a
hypothetical involving limited partners in a partnership and
citing *Higgins* and *Whipple*, that

> [e]xpenses incurred by a limited partner are more like
> expenses incurred by a shareholder because both a
> limited partner and a shareholder are merely investing,
> rather than participating, in a trade or business.  A
> limited partner's investment in a partnership is really
> no different than holding corporate stock in that a
> certain cash flow or return is expected from the
> efforts of others.

I.R.S. Technical Advice Mem. 9728002, 1997 WL 381972 (July 11,
1997).

Thus, the Appeals Board's decision appears in direct
conflict with the governing Supreme Court precedent, not to
mention Tax Code interpretations it is bound to follow.  *See*
*Higgins*, 312 U.S. at 218; *Whipple*, 373 U.S. at 202; *cf. Rodriguez*
*de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)
(cautioning that decision makers "should follow the case which
directly controls, leaving to [the Supreme] Court the prerogative
of overruling its own decisions").

Moreover, the Appeals Board's analysis under *Groetzinger* is
incorrect as a matter of law.  So long as *Higgins* is still good
law, continuity and regularity cannot be shown by the mere size

18

of the investment or its profitability.  *See Higgins*, 312 U.S. at
218 ("The petitioner merely kept records and collected interest
and dividends from his securities, through managerial attention
for his investments.  No matter how large the estate or how
continuous or extended the work required may be, such facts are
not sufficient as a matter of law" to make his activities a trade
or business).

In short, I decline to give any deference to the 2007 PBGC
Appeals Board opinion because I do not find it persuasive.

3.   *Application of Governing Law to the Sun Funds*

Undistracted by an errant agency decision, I turn now to
consideration of whether the Sun Funds were engaged in a "trade
or business" under governing law.

The parties do not dispute that under the first prong of
*Goetzinger*'s two-part test, the primary purpose of the Sun Funds
is to make a profit.  Consequently, whether the Sun Funds were
engaged in a "trade or business" turns on whether the Sun Funds
were engaged in activity with "continuity or regularity."  It is,
however, well settled that merely holding passive investment
interests is not sufficiently continuous or regular to constitute
a "trade or business."  *See, e.g.*, *Cent. States, Se. & Sw. Areas
Pension Fund*, 238 F.3d at 895-96 ("[P]ossession of a property, be
it stocks, commodities, leases, or something else, without more
is the hallmark of an investment.  Thus, mere ownership of a

19

property (as opposed to activities taken with regard to the property) cannot be considered in determining whether conduct is regular or continuous.").

The Sun Funds contend that their investments in Sun Scott Brass, LLC were one-time investments and that they served as passive pools of investing funds whose only income was capital gains and dividends.  The Pension Fund challenges this characterization.  First, the Pension Fund alleges that the Sun Funds played an active role in managing Scott Brass, Inc. after investing in it, taking over the "majority" of Scott Brass, Inc.'s board of director positions, injecting themselves into the daily operation of the corporation, and thereby engaging in Scott Brass, Inc.'s "trade or business."  Second, the Pension Fund notes that the Sun Funds received reimbursements and other non-investment income, and therefore contend that they do not fit into the "trade or business" exception for purely passive investments.  The Pension Fund argues that the Sun Funds' income, combined with the more active role in managing Scott Brass, Inc., qualify the Sun Funds as a "trade or business" for purposes of the statute.

Even taken in the light most favorable to the Pension Fund, the record establishes that the Sun Funds are not a "trade or business."  The Sun Funds do not have any employees, own any office space, or make or sell any goods.  They each made a single

investment in Sun Scott Brass, LLC.   The tax returns for each fund list only investment income in the form of dividends and capital gains.

Similarly, although Scott Brass, Inc. was required to give weekly updates and reports to employees of Sun Capital Advisors pursuant to consulting and management agreements, that does not mean that the Sun Funds themselves were actively managing the business or otherwise performing more than the type of management and oversight found not to be a "trade or business" in *Higgins* and *Whipple*.

That the Sun Funds elected members of the boards of directors of Scott Brass Holding Corp., and in turn Scott Brass, Inc., does not make them actively involved in the management of Scott Brass, Inc. because they performed those acts only as shareholders.   *Cf. Bell* v. *Comm'r*, 1998 WL 155448, at *10 (T.C. Apr. 6, 1998) ("A shareholder is not engaged in the trade or business in which the corporation is engaged unless the shareholder engages in such trade or business apart from affiliation with the corporations.").

Other examples offered by the Pension Fund to demonstrate alleged control and management by the Sun Funds are unavailing. Employees of Sun Capital Advisors, not of the Sun Funds (which has no employees), interviewed potential CFO candidates (though the CEO of Scott Brass, Inc. ultimately made the hiring decision)

and gave advice on budgets, union negotiations, and other matters within the scope of their management and consulting agreements.

The Pension Fund contends that the Sun Funds' income was not pure investment income because they received investment reimbursements directly, and their general partners collected additional non-investment fees.  This contention is insupportable.  First, the tax returns filed by the Sun Funds each show that the only income for each fund was from capital gains or dividends, the two types of investment income.  Second, and more fundamentally, investment reimbursements are not considered income at all.  *See, e.g.*, *Muegge* v. *Comm'r*, 2000 WL 1056473, at *4 (T.C. Aug. 2, 2000) ("A reimbursement is in the nature of a repayment of borrowed funds, which is not taxable.").

Finally, the management and consulting fees were paid through a contractual arrangement between the management companies of the general partners and Scott Brass Holding Corp., and did not involve the Sun Funds themselves.  That the general partner of each fund was receiving non-investment income does not mean that the Sun Fund itself was engaged in the full range of the general partner's activities.

It is of no moment that the Management Agreements were signed by the same person representing both parties in the transaction.  It is a basic principle of corporate law that officers holding dual posts can "wear different hats" when

working for each.  *Cf., e.g., Yankee Gas Servs. Co.* v. *UGI*

*Utils., Inc.*, 616 F. Supp. 2d 228, 265 (D. Conn. 2009) (noting

"the presumption is that dual officers can and do wear different

hats when working for the parent and when working for the

subsidiary").  Though a theoretical shareholder might be able to

claim a breach of fiduciary duty arising from such a transaction,

such a dual role does not convert the Sun Funds' investment

activities into a "trade or business" under the statute.

Because I find that neither of the Sun Funds is a "trade or

business," I do not reach, nor do I decide, the issue of "common

control."

C.   Partnership Liability

The Pension Fund makes the creative (although ultimately

unpersuasive) argument that even if the plaintiff Sun Funds are

not trades or businesses, they should nevertheless be jointly and

severally liable as partners of Sun Scott Brass, LLC.[2]  The

Pension Fund argues that ERISA, MPPAA, and related federal tax

regulations do not recognize limited liability companies and that

Sun Scott Brass, LLC should be considered an unincorporated

organization, therefore, by default, a partnership whose

liabilities extend to its partners: the plaintiff Sun Funds.  *Cf.*

---

[2] Because I find, as a threshold matter, that the Sun Funds
cannot be held liable for the debts of Sun Scott Brass, LLC, I do
not reach or decide the question whether Sun Scott Brass, LLC can
be held liable for the withdrawal liability incurred by Scott
Brass, Inc.

*Pension Benefit Guar. Corp.* v. *East Dayton Tool & Die Co.*, 14 F.3d 1122, 1227 (6th Cir. 1994) ("ERISA provide[s] joint and several liability for partners where partnership debts exist.")

This argument requires some interpretive gymnastics and doesn't quite stick upon its landing. ERISA requires that the regulations governing the ambit of the phrase "trades or businesses . . . under common control" be "consistent and coextensive with regulations" of the Tax Code. 29 U.S.C. § 1301(b). However, the Tax code does not define, nor does it recognize, so-called hybrid entities such as limited liability companies and limited liability partnerships. *See generally* 26 U.S.C. § 7701; *see also Littriello* v. *United States*, 484 F.3d 372, 376 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1290 (2008)("[T]he hybrid entities [limited liability companies and limited liability partnerships and the like] . . . still are not[] explicitly covered by the definitions set out in § 7701."). Instead, the IRS, considers such an entity an unincorporated organization and affords it the option to "elect its classification for Federal tax purposes . . . as either an association (and thus a corporation . . .) or a partnership." 26 C.F.R. § 301.7701-3. Sun Scott Brass, LLC's limited liability agreement elects to "be treated as a partnership for federal income tax purposes . . . ."

From this, the Pension Fund reasons that Sun Scott Brass, LLC should be treated as a partnership, not only for purposes of the meaning of "trades or businesses . . . under common control" or the Federal tax law, but also for other purposes, such as imputing one partner's liability to another in spite of Sun Scott Brass, LLC's chosen corporate form.  This reasoning stands in direct conflict with the plain language of the regulations and the case law governing corporate liability.

The federal tax regulation that the Pension Fund relies on specifically limits its own application to "Federal tax purposes."  26 C.F.R. § 301.7701-3.  Likewise, the election in Sun Scott Brass, LLC's limited liability agreement to be treated as a partnership is expressly limited to "federal income tax purposes and, if applicable, state income or franchise tax purposes."  The Pension Fund cites no authority which might justify extending the federal tax law's understanding of corporate forms into the realm of imputed liability.  In fact, it is long-settled that state law, and not federal law, governs the bounds of corporate liability in the absence of a conflicting federal incorporation statute.  *Anderson* v. *Abbott*, 321 U.S. 349, 365 (1944) ("[L]imitation on the liability of stockholders of . . . corporations . . . [is] enforceable in federal courts under the rule of *Erie R. Co.* v. *Tompkins*."); *In re Aoki*, 323 B.R. 803, 811

(BAP 1st Cir. 2005) ("The existence and legal characteristics of a corporation are governed by state law.").

In the absence of supervening federal authority, Delaware state law, not federal law, governs, and as members of a limited liability company, the Sun Funds "shall not be obligated personally for any . . . debt, obligation or liability of the limited liability company solely by reason of being a member . . . ."  6 Del. C. § 18-303(a).  Therefore, the plaintiff Sun Funds are not be responsible for withdrawal liability as partners of Sun Scott Brass, LLC, if indeed, Sun Scott Brass, LLC itself bears any responsibility for the withdrawal liability.

D.   Evade or Avoid Liability Analysis

Because the Sun Funds are not "trades or businesses" within the meaning of § 1301 and are not liable as partners of Sun Scott Brass, LLC, the Pension Fund's pursuit of withdrawal liability must stand or fall on its "evade or avoid" claim under § 1392(c). The MPPAA provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under [the MPPAA], this part shall be applied and liability shall be determined and collected without regard to such transaction."  29 U.S.C. § 1392(c).  Thus, if a party[3] can be shown to have (1) completed a

---

[3]  The parties disagree whether § 1392(c) is limited to employers, who must be a "trade or business," or if it may be applied more broadly.  I am persuaded by the caselaw cited by the Pension Fund that § 1392(c) was not intended to be drawn as narrowly as the Sun Funds would have it.  *See Bd. of Trs., Sheet*

transaction, (2) with the "principal purpose" of avoiding withdrawal liabilities, a court can ignore that transaction in determining the withdrawal liability owed.

Neither "transaction" nor "evade or avoid" are defined in the statute.  Courts have, instead, interpreted them according to their plain meaning in the context of the statutory purpose. *See, e.g.*, *SUPERVALU, Inc*. v. *Bd. of Trs. of Sw. Pa. and W. Md. Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 340-41 (3d Cir. 2007).  The adjective "principal" means "most important, consequential, or influential."  Webster's Third New Int'l Dictionary 1802 (1986).  The noun "purpose" means "an object, effect, or result aimed at, intended, or attained."  *Id.* at 1847. The noun "transaction" means "an act, process, or instance of transacting," and the verb "transact" means "to prosecute negotiations" or "carry on business."  *Id.* at 2425.  The verb

*Metal Workers' Nat'l Pension Fund* v. *Illinois Range, Inc.*, 186 F.R.D. 498, 503 (N.D. Ill. 1999) ("Extending liability beyond employers is consistent with Congress's intent as demonstrated by the language Congress used in drafting the act.  When Congress sought to limit liability to a narrow group of parties, it so indicated in its choice of terms.  *See* 29 U.S.C. § 1381 (liability limited to 'employer').  However, Congress' choice of terms was not so narrow in the jurisdictional section, thus suggesting that Congress intended ERISA liability to be imposed on a broader group than just employers.  *See* 29 U.S.C. § 1451 (liability may be imposed on 'any party').")*; IUE AFL-CIO Pension Fund* v. *Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) ("Reading sections 1451(a)(1) and 1392(c) together, if a pension fund . . . is adversely affected by the acts of *any party* who has attempted to 'evade or avoid liability' under the MPPAA . . . then the MPPAA shall be applied 'without regard to such transaction.'") (emphasis added).

"evade" means "to manage to avoid the performance of (an obligation)" or "to get around (an intellectual obstacle)." *Id.* at 786.  The verb "avoid" means "to keep away from" or "to prevent the occurrence or effectiveness of." *Id.* at 151.  Thus, under the plain meaning of the text, a person or entity violates § 1392(c) when it carries out a business transaction whose most important goal is getting around or preventing withdrawal liability.

The transaction at issue is the decision by the Sun Funds to invest in Sun Scott Brass, LLC in a 70%/30% ratio.  The Pension Fund argues that the Sun Funds' "principal purpose" in dividing the ownership of Scott Brass, Inc. in this manner was to "evade or avoid" its withdrawal liability, which only attaches to entities with a greater than 80% interest in the employer who accrued the withdrawal liability.  *See* 29 U.S.C. § 1301(b)(1) ("[T]rades or businesses . . . under common control shall be treated as . . . a single employer."); 26 C.F.R. § 414(b)(1) (common control may be satisfied by a chain of organizations connected through ownership of a controlling interest); 26 C.F.R. § 414(b)(2) (a controlling interest requires ownership of either stock or profit and capital interest totaling 80%).  Therefore, the Pension Fund requests that this court ignore the Sun Funds'

70%/30% investment split and aggregate the two funds' ownership into one 100% ownership piece, attributable to Sun Fund IV.[4]

The Sun Funds argue that their purpose in dividing their ownership of Scott Brass, Inc. was threefold: (1) Fund III was nearing the end of its shelf-life[5] and could afford to invest 30%; (2) splitting the investment between multiple funds decreased the risk to each fund; and (3) on advice from their attorney, the Sun Funds could minimize their exposure to potential future withdrawal liability by keeping any one Fund's ownership below 80%. The Sun Funds dispute that their "primary purpose" was to avoid withdrawal liability, but concede that they did consider the potential to lessen their exposure to liability in determining the percentage split of the Sun Funds' investment in Scott Brass, Inc.

On the one hand, the Sun Funds point to numerous facts in the record that suggest that the "primary purpose" of their investment was not to avoid withdrawal liability. For example, as profit-seeking investment businesses it would not be in the interest of the Sun Funds to invest in companies they thought

---

[4] Sun Fund IV was the larger of the two investment funds, and concedes that it had sufficient funds to obtain 100% of the membership interest in Sun Scott Brass, LLC at the time of the investment.

[5] Each fund took limited partner investments for a period of six years, before closing to additional investments for operation over an additional four years.

were going to fail and in doing so potentially subject themselves
to withdrawal liability.  Likewise, Scott Brass, Inc. continued
to pay into the Pension Fund for approximately two years after
the Sun Funds invested in it and up until bankruptcy, supporting
the Sun Funds' contention that they did not divide their interest
in Sun Scott Brass, LLC primarily to "evade or avoid" withdrawal
liability.  *Cf. Dorn's Transp., Inc*. v. *Teamsters Pension Trust
Fund of Philadelphia*, 787 F.2d 897, 902 (3d Cir. 1986) ("[W]hen
the seller enters a transaction to escape liability, but the
buyer had no intention of taking subsequent actions that will
reduce the payments owing to the Plan, it does not appear that a
'principal purpose of the transaction' as a whole is to escape
liability.").  The other considerations to which the Sun Funds
point — the investing shelf life of Sun Fund III and risk-
spreading by diversifying assets — are also valid alternative
explanations for the decision to split the Sun Funds' investment
70%/30%.

On the other hand, the Sun Funds do not deny that they
considered legal advice that they could minimize their chances of
facing withdrawal liability in the future if they limited their
investments to less than the 80% threshold.  The Pension Fund
points to deposition testimony and an email that a jury could
read to support the notion that the "principal purpose" of the
70%/30% split was to "evade or avoid" withdrawal liability.  One

of the limited partners of Sun Fund IV's general partner and an employee of Sun Capital Advisors, Inc., described the investment ratio of Sun Fund IV and Sun Fund III as follows: "Fund IV;[sic] $2.1mm.  Fund III: $0.9mm.  Total investment: $3mm (on the nose). *Did this due to unfunded pension liability*." (emphasis added).

With a wooden reading of the statute, this might be the end of the summary judgment practice, because the email alone could be considered sufficient to create a genuine issue of material fact for trial.  However, some significant problems are presented by the Pension Fund's theory of liability under 29 U.S.C. § 1392(c).

Most fundamentally, it is not clear that Congress intended 29 U.S.C. § 1392(c) to apply in this situation at all. Statements from the legislative history suggest that the focus of the statute was on "essentially fraudulent maneuvers lacking in economic substance" by employer-sellers, and not by outside investors:

> We intend that employers not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than bona fide and arm's length.  Hence, for example, a building and construction industry employer—or for that matter any employer contributing to a plan—will not be able to evade withdrawal liability by going out of business and resuming business under a different identity.

*Cuyamaca Meats, Inc.* v. *San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491, 499 (9th Cir.

31

1987) (quoting 126 Cong. Reg. 23038 (1980) (statement of Rep. Frank Thompson)).

The example given by Representative Thompson of an employer going out of business then resuming business under a new name evidences a concern about evasion by sellers, not forward-looking financial planning by investors like the Sun Funds.  If the purpose of ERISA is to ensure that employees will get their pensions, and the purpose of the MPPAA was to change the inclination of employers to withdraw from pension funds, then it is logical for the focus of § 1392(c) likewise to focus on the employer-seller, not an outside investor.  This is why the Eighth Circuit has said that the congressional purpose behind ERISA is not implicated when a pension fund seeks to pierce the corporate veil to collect unpaid contributions. *See Greater Kansas City Laborers Pension Fund,* 104 F.3d at 1055 ("Although the underlying congressional policy behind ERISA favors the disregard of the corporate entity in situations where employees are denied their pension benefits, such policy interests are not implicated in the present case, which does not involve an individual pensioner's claim for benefits; rather, it involves a pension fund's attempt to collect unpaid contributions.").

The idea that § 1392(c) is narrower than the Pension Fund alleges is also supported by the language of the statute itself. If the Pension Fund is correct that the statute was meant to

apply to investors like the Sun Funds, then the language of the statute does not provide a meaningful remedy.  The sole remedy of 29 U.S.C. § 1392(c) directs a court to ignore the transaction in determining liability.  *See* 29 U.S.C. § 1392(c) ("[L]iability shall be determined and collected without regard to such transaction.").  However, in a case like the one before me, where the employer-seller has gone bankrupt, if I were to ignore the investor-buyers' transaction, the investment in the first instance, the Pension Fund would be left with nothing because the plain terms of § 1392(c) sever any connection between the insolvent employer and the buyer.  Clearly, such a result would conflict with Congress' stated goals of ensuring that promised pension plans would be financially solvent and available to private sector employees who have earned them.

To be sure, with some imaginative intervention, a court might undertake to reach back and rearrange the investors' proportionate underlying shares in order to create a circumstance in which one of the Sun Funds is deemed to have an 80% interest and thereby make that Sun Fund statutorily liable.  But that intervention would require a disregard of business organization formalities in the absence of some recognized grounds for doing so.

The language of the statute further suggests that it is aimed at sellers, not investors, by its use of the terms "evade

or avoid" in the present tense.  It would be unlikely for an investor purchasing a business to be doing so with the intent at the time of investment that the business fail, or with knowledge that such failure was imminent.  Thus, at the time of purchasing the business, all that likely can be said about the investor's intentions with regard to withdrawal liability is that the buyer hopes to minimize its chances of someday being liable for them. But the employer-seller, unlike the buyer, is in a position actively to evade or avoid liability at the time of the transaction.  As a practical matter, the employer-seller was plainly the object of Congress' scrutiny when passing § 1392(c). *Cf. Dorn's Transp., Inc.*, 787 F.2d at 902 ("[W]hen the seller enters a transaction to escape liability, but the buyer had no intention of taking subsequent actions that will reduce the payments owing to the Plan, it does not appear that a 'principal purpose of the transaction' as a whole is to escape liability.").

Perhaps these concerns explain the dearth of caselaw on point.  I have been unable to find any case that reads the statute to achieve what the Pension Fund requests here.  The only case the Pension Fund cites, *SUPERVALU, Inc.*, is not on point. 500 F.3d at 334-37.  There, SUPERVALU was a contributing employer to a multiemployer pension plan.  The collective bargaining agreement that SUPERVALU had with the Teamsters required SUPERVALU to contribute to the pension plan through January 31,

2003.  At the beginning of 2002, SUPERVALU decided to close a
facility covered by the collective bargaining agreement, an
action that would trigger withdrawal liability under ERISA.  *Id.*
at 337.  SUPERVALU negotiated with the Union, and the parties
agreed to substitute a new collective bargaining agreement for
the existing one and effectuate SUPERVALU's withdrawal from the
pension fund prior to the end of the pension plan's 2001-2002
year so that SUPERVALU would not incur withdrawal liability for
the 2002-2003 year.  *Id.* at 337-338.  As consideration for the
new agreement, SUPERVALU made additional payments directly to
employees.  *Id.* at 338.

In a later arbitration, the arbitrator found that the
"principal purpose" of this transaction was to "evade or avoid"
withdrawal liability in violation of 29 U.S.C. § 1392(c).  *Id.* at
339.  The Third Circuit affirmed the arbitrator's decision,
finding that "the only reason that SUPERVALU chose to renegotiate
the collective bargaining agreements less than a month before the
facility closed was to bring its withdrawal date within the
2001-2002 plan year in order to avoid withdrawal liability for
the 2002-2003 plan year. . . . Therefore, SUPERVALU acted with a
principal purpose of escaping withdrawal liability in violation
of § [1392(c)]."  *Id.* at 341-42.

This case is distinguishable from *SUPERVALU, Inc.*  In that
case, the sole purpose of the new collective bargaining agreement

was to avoid withdrawal liability.  The illicit transaction took place when withdrawal was pre-determined, and the parties were negotiating with the knowledge and anticipation that withdrawal would occur.  Here, however, the allegedly illicit transaction took place in a very different context.  The Sun Funds decided to split their investments in Sun Scott Brass, LLC, 70%/30% at the beginning of their investment in the company, two years before it went bankrupt, with the hope that the company would have future success and return a profit on their investment.  While the record does contain evidence that the Sun Funds considered potential withdrawal liability when structuring their initial investments, that consideration was not a principal purpose of the investment in any way approximating the transaction in *SUPERVALU Inc.*  Here, there was no expectation of withdrawal, only the ever present future risk of it.  Thus, the decision to invest less-than-controlling proportions (that is, less than 80% ownership by any one entity) was aimed not at avoiding or evading a known or impending withdrawal liability, but rather at minimizing the risk of an uncertain, unplanned future withdrawal, among other considerations.

A transaction that "evades or avoids" withdrawal liability when withdrawal is a pre-determined certainty is readily distinguishable from a transaction that reduces a prospective, uncertain future risk of withdrawal liability.  If it were

36

otherwise, nearly any decision whether or not to invest, and in what proportions, could be construed as a transaction to "evade or avoid" withdrawal liability.  Congress could not have intended an interpretation with such broad-sweeping results, because one of its primary concerns with ERISA and the MPPAA was to ensure the financial stability of pension plans, and, correspondingly, provide incentives to investment.  If an investor has a large capital supply, but decides to obtain less than an 80% share in a company, a court, without explicit legislative direction, should not construe that decision as primarily intended to "evade or avoid" withdrawal liability.  If it did so, investors would be disincentivized from providing capital for companies subject to multiemployer pension plan obligations out of concern that they will be subject to an indeterminate amount of withdrawal liability at an indeterminate future time.  This result clearly conflicts with the congressional purpose of ensuring financially sound multiemployer pension plans.  *Cf*. 29 U.S.C. § 1001a (MPPAA congressional policy statement).  If Congress chooses to realign incentives in this area in such a counterintuitive fashion, it must do so with a clarity that the current statute does not provide.

Both the plain meaning of the statute and the policies underlying it counsel that 29 U.S.C. § 1392(c) was not meant to apply to the situation in this case.  Consequently, I have

37

granted the Sun Funds' motion for summary judgment finding that they did not attempt to "evade or avoid" liability in violation of 29 U.S.C. § 1392(c).

### IV.   CONCLUSION

For the foregoing reasons, I have granted the Sun Funds' motion for summary judgment (Dkt. No. 76), and have denied the Pension Fund's cross-motion for summary judgment (Dkt. No. 82). The Clerk shall enter judgment for the Plaintiffs accordingly.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE