UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
SUN CAPITAL PARTNERS III, LP,     )
SUN CAPITAL PARTNERS III QP, LP,  )
and SUN CAPITAL PARTNERS IV, LP,  )
                                  )
          Plaintiffs/             )    CIVIL ACTION NO.
          Counter-Defendants,     )    10-10921-DPW
v.                                )
                                  )
NEW ENGLAND TEAMSTERS AND         )
TRUCKING INDUSTRY PENSION FUND,   )
                                  )
          Defendant/              )
          Counter-Plaintiff.      )
```

MEMORANDUM & ORDER
March 28, 2016

This case addresses whether the plaintiffs — private equity funds, referred to herein as "Sun Fund III" and "Sun Fund IV" — may be held liable under the Multiemployer Pension Plan Amendments Act ("MPPAA") for the pro rata share of unfunded vested benefits owed to a multiemployer pension fund by a bankrupt company, Scott Brass, Inc. ("SBI"), that is owned by the funds. The plaintiffs seek a declaratory judgment that they are not liable for the payment of such withdrawal liability. The defendant has counter-claimed seeking a declaratory judgment that the private equity funds are jointly and severally liable for the amounts owed by Scott Brass Inc.

In September of 2011, the plaintiffs and defendant filed cross-motions for summary judgment. In September 2012, I granted the plaintiffs' motion for summary judgment and denied

1

that of the defendant.  On appeal, the First Circuit reversed in part, vacated in part, and affirmed in part my grant of summary judgment, and remanded the case to this court for further proceedings to answer two questions: (1) Whether Sun Capital Partners III, LP and Sun Capital Partners III QP, LP are engaged in "trade or business"; and (2) Whether the plaintiffs were under "common control" with Scott Brass, Inc. within the meaning of 29 U.S.C. § 1301(b)(1).

The facts relevant to this dispute have been described extensively in the two prior reported opinions in this litigation.  *Sun Capital Partners III, LP* v. *New Eng. Teamsters & Trucking Indus. Pension Fund*, 903 F. Supp. 2d 107 (D. Mass. 2012), *Sun Capital Partners III, LP* v. *New Eng. Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129 (1st Cir. 2013).  I will assume general familiarity with those opinions and discuss facts more specifically in connection with the remaining questions.[1]

For the sake of clarity, I provide a brief restatement of the entities involved.[2]  Scott Brass, Inc. ("SBI"), is the entity

---

[1]  As discussed further below, the parties have made some clarifications, corrections, and additions to those facts relied upon by me and by the First Circuit in the evaluation of the previous motions for summary judgment.
[2]  I have also attached a chart as Appendix A to provide a simplified illustration of the ownership and managerial roles of the several plaintiff related entities.

that incurred withdrawal liability under the MPPAA after it went bankrupt and ceased payments into the defendant Pension Fund. At the time of its bankruptcy, it was owned by Scott Brass Holding Corp., which in turn was owned by Sun Scott Brass, LLC. Sun Scott Brass, LLC was formed by Sun Fund III, which owned 30 percent of the LLC, and Sun Fund IV, which owned the other 70 percent. The two Sun Funds are investment funds and limited partnerships. Their general partners are Sun Capital Advisors III, LP and Sun Capital Advisors IV, LP, respectively, and those general partners each have a limited partner committee made up of Marc Leder and Rodger Krouse. Leder and Krouse are also the co-CEOs of Sun Capital Advisors, Inc., which advises the Sun Funds, structures their deals and provides management consulting and employees to the portfolio companies owned by the Funds. Additional detail is provided in the prior opinions and, as needed, in the opinion below; additionally, an organizational chart is provided as an appendix to this memorandum.

The parties have filed renewed cross-motions for summary judgment setting forth their positions on the questions posed by the First Circuit.

## I. WHETHER THE SUN FUNDS ARE ENGAGED IN TRADE OR BUSINESS

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") provides: "For purposes of this subchapter, under

regulations prescribed by the corporation, all employees of
trades or businesses (whether or not incorporated) which are
under common control shall be treated as employed by a single
employer and all such trades and businesses as a single
employer."  29 U.S.C. § 1301(b)(1).

In the previous appeal of this case, the First Circuit set
forth the standard for determining whether an investor is a
"trade or business" under the statute.  The First Circuit stated
that, under the MPPAA, "[t]o impose withdrawal liability on an
organization other than the one obligated to the [pension] Fund,
two conditions must be satisfied: 1) the organization must be
under 'common control' with the obligated organization, and 2)
the organization must be a trade or business."  *Sun Capital*, 724
F.3d at 138 (quoting *McDougall* v. *Pioneer Ranch Ltd. P'ship*, 494
F.3d 571, 577 (7th Cir. 2007)).

The First Circuit explained that "[w]here the MPPAA issue
is one of whether there is mere passive investment to defeat
pension withdrawal liability, we are persuaded that some form of
an 'investment plus' approach is appropriate when evaluating the
'trade or business' prong of § 1301(b)(1), depending on what the
'plus' is."  *Sun Capital*, 724 F.3d at 141.  Declining "to set
forth general guidelines for what the 'plus' is," the First
Circuit found it sufficient that "on the undisputed facts of
this case, Sun Fund IV is a 'trade or business' for purposes of

§ 1301(b)(1)." *Id.*  In reaching that determination, the First

Circuit adopted a "very fact-specific approach . . . tak[ing]

into account a number of factors [and] cautioning that none is

dispositive in and of itself." *Id.*  Many of the factors leading

to the determination that Sun Fund IV was engaged in trade and

business are commonly established as to both Sun Fund IV and Sun

Fund III:

> The Sun Funds make investments in portfolio companies
> with the principal purpose of making a profit . . . [T]he
> Sun Funds have also undertaken activities as to the SBI
> property.  The Sun Funds' limited partnership agreements
> and private placement memos explain that the Funds are
> actively involved in the management and operation of the
> companies in which they invest . . . Each Sun Fund
> agreement states, for instance, that a "principal
> purpose" of the partnership is the "manag[ement] and
> supervisi[on]" of its investments. The agreements also
> give the general partner of each Sun Fund exclusive and
> wide-ranging management authority . . . the Sun Funds'
> controlling stake in SBI placed them and their
> affiliated entities in a position where they were
> intimately involved in the management and operation of
> the company . . . through a series of appointments, the
> Sun Funds were able to place SCAI employees in two of
> the three director positions at SBI, resulting in SCAI
> employees controlling the SBI board.

*Sun Capital*, 724 F.3d at 141-143.  The First Circuit's

determination that Sun Fund IV was a "trade or business" also

relied on one characteristic that the court was unable to

determine was also a characteristic of Sun Fund III:

> [T]he Sun Funds' active involvement in management under
> the agreements provided a direct economic benefit to at
> least Sun Fund IV that an ordinary, passive investor
> would not derive: an offset against the management fees
> it otherwise would have paid its general partner for

managing the investment in SBI.  Here, SBI made payments
of more than $186,368.44 to Sun Fund IV's general
partner, which were offset against the fees Sun Fund IV
had to pay to its general partner.
*Id.* at 143 (footnotes omitted).[3]

The First Circuit held that the sum of these "plus" factors

satisfied the "investment-plus" test for the Sun Fund IV.

However, because it was unable to determine whether Sun Fund III

received a similar economic benefit in the form of an off-set of

fees otherwise owed by Sun Fund III to its general partner, the

First Circuit was unable to determine whether Sun Fund III was

engaged in a "trade or business."  The First Circuit left that

issue to this court's determination: "We remand the § 1301(b)(1)

claim of liability to the district court to resolve whether Sun

Fund III received any benefit from an offset from fees paid by

SBI and for the district court to determine the issue of common

control."  *Id.* at 148-49.

---

[3] In its initial statement of facts in support of its motion for
summary judgment, the Pension Fund stated that the amount of the
management fees paid by Scott Brass, Inc. was $186,368.44--a
figure adopted by the First Circuit.  In their response to the
statement of facts, the Sun Funds denied the accuracy of the
Pension Fund's assertion and stated that "the payments made by
SBI were greater than $186,368.44."  In response to the Pension
Fund's supplemental statement of facts, the plaintiffs indicated
that "Scott Brass, Inc. paid $664,027.78 in management fees to
Sun Capital Partners Management IV, LLC."  The defendant
concedes that the $186,368.44 figure is inaccurate and that
$664,027.78 is the correct figure.  The difference in the
figures is, nevertheless, immaterial to the resolution of this
lawsuit.

On remand, the Sun Funds contend that the First Circuit, as well as this court in its previous summary judgment opinion, misstated relevant facts regarding the management fee offsets accruing to the Sun Funds as a result of the management of SBI. As they explain, "[i]n this case, Sun Fund III did receive an offset of the management fee owed to its GP from fees paid by SBI . . . Ironically, Sun Fund IV did not."

To sort out this state of affairs, I will set forth the facts as I now understand them to be and then analyze those facts under the rubric set forth by the First Circuit.

A.  *The Sun Fund III and Sun Fund IV Limited Partnership Agreements*

Under the limited partnership agreements (the "LP Agreements") establishing Sun Fund III and Sun Fund IV,[4] all partners, including the general partners of each Fund (Sun Capital Advisors III, LP and Sun Capital Advisors IV, LP, respectively), are obligated to make contributions to the capital of the partnerships upon receiving a capital call.  The amount of the contributions required of the General Partners are determined based upon the pro rata share of each partner's commitments.  (Jt. Ex. 12, § 5.1(a)-(b)).[5]

---

[4] The agreements setting up the funds appear identical in all relevant respects.

[5] Under the LP Agreement, the General Partner's Commitment is not less than 5% of the aggregate commitments of all the partners. (Jt. Ex. 12, "Commitment" Definition)

In addition to being obligated to make capital contributions to the Sun Funds, the General Partners are entitled to an annual management fee (the "Management Fee") from the Sun Funds, calculated as a percentage of the aggregate commitments or invested assets.  (Jt. Ex. 12, § 5.1(a)-(b)).

Under 5.1(c) of the Sun Fund LP Agreements, the General Partners may elect to "waive" their management fees, generating what is termed in the LP Agreements a "Waived Fee Amount." These "Waived Fee Amounts" reduce the General Partners' obligation to contribute to future capital calls made by the Sun Funds.  Section 3.1(a)(ii) of the Sun Fund agreement provides:

> [A]t such time as the General Partner delivers any Capital Call Notice, the General Partner's required Capital Contributions in respect of anticipated or actual Investments and/or expenses incurred directly in connection with the making, maintaining or disposing of such Investments, at the General Partner's election, shall be reduced by an amount designated by the General Partner up to the lesser of (A) the amount of Capital Contributions otherwise required to be made by the General Partner . . . or (B) the amount of any existing Unapplied Waived Fee amounts . . . .

In addition to waivers, the Management Fee owed by the Sun Funds to its General Partner may be reduced in a second way. Under Section 5.1(d) of the LP Agreement, after the application of Waived Fee Amounts under Section 5.1(c), the Management Fee is further reduced by "100% of any Directors Fees, 50% of any Corporate Services Fees, 50% of any Investment Banking Fees and 50% of any Net Fees" as well as by the aggregate amount of any

"private placement fees" (the "Management Fee Offsets").  The Sun Funds have explained the function of this term of the limited partner agreements thus: "[T]he limited partners of the Sun Funds negotiated offsets of the management fees they owed the general partners of the Sun Funds for the payment of other fees to the general partners such as those covered under the Management Services Agreement [between Scott Brass Holding Corp and SCP Management IV, LLC.]." [Dkt. 149 Resp. No. 115].

When no Management Fees are owed or the amount of Management Fee Offsets is greater than the Management Fees owed (after taking into account any fee waivers elected by the General Partners), Management Fee Offset "carryforwards" are generated, which can be used to offset future Management Fees owed by the Sun Funds to their General Partners: In the event that the amount of Directors Fees, Corporate Services Fees, Investment Banking Fees, Net Fees or private place fees to be applied against the Management Fee exceeds the Management Fee for the immediately succeeding six-month period, such excess shall be carried forward to reduce the Management Fee payable in the following six-month periods.

**B.   *The Sun Scott Brass Holding Corp. Management Agreement***

Scott Brass Holding Corp. and Sun Capital Partners Management IV, LLC ("SCP Management IV") (which is a subsidiary of Sun Capital Advisors IV, LP) entered into an agreement (the

9

"Management Agreement") pursuant to which the latter would provide "management and consulting services regarding the business of [SBI]."  The fees paid to SCP Management IV under this Management Agreement are offset against the Management Fees, or, if no Management Fees are presently owed, are carried forward as potential future offsets pursuant to Section 5.1(d) of the LP Agreements.

In addition, pursuant to Section 5.1(d) of the LP Agreements, the amounts paid to SCP Management IV are allocated pro rata between Sun Fund III and Sun Fund IV based upon their proportionate holdings in Sun Scott Brass, LLC--that is 70% to Sun Fund IV and 30% to Sun Fund III.

## C.   *The Payment of Management Fees, Offsets, and Waivers to Sun Fund III*

Scott Brass, Inc. paid $664,027.78 in management fees to SCP Management IV.  As described above, 30% of this amount is allocated as a potential Management Fee Offset or Carryforward to Sun Fund III and 70% is allocated to Sun Fund IV.

In each year from 2005 until 2012 (spanning from the time of the purchase of Scott Brass, Inc., in February 2007 until Scott Brass, Inc.'s bankruptcy in November 2008), Management Fees were owed by Sun Fund III to its general partner and, accordingly, the amount owed by Sun Fund III was reduced by the

amount paid to SCP Management IV by Scott Brass Holding Corp. and allocated to Sun Fund III.

Therefore, as the Sun Funds have stated and in answer to the question posed by the First Circuit, Sun Fund III has received an economic benefit in the form of "an offset against the management fees it otherwise would have paid its general partner for managing the investment in SBI." *Sun Capital Partners*, 724 F.3d at 143.  The "trade or business" prong of the test for liability under § 1301(b)(1) of the MPPAA is satisfied as to Sun Fund III.

**D.    *The Payment of Management Fees, Offsets, and Waivers to and From Sun Fund IV***

Although I have answered the first question posed by the First Circuit and am bound by the law of the case as determined by the First Circuit, *Ellis* v. *United States*, 313 F.3d 636, 646-48 (1st Cir. 2002), I feel obligated to evaluate the Sun Funds' contention that the First Circuit's holding that the "trade or business" requirement has been satisfied as to Sun Fund IV was based upon an erroneous factual determination.

Scott Brass, Inc. was acquired by the Sun Funds in February of 2007 and entered bankruptcy (incurring withdrawal liability under the MPPAA) in November 2008.  Although Sun Fund IV paid and owed management fees in 2005 and 2006, before the acquisition of Scott Brass, Inc., and in 2010, 2011, and 2012,

11

after the date of the bankruptcy, the General Partner of Sun Fund IV waived its management fees for the years 2007 through 2009.  Therefore, from 2007 through 2009, although fees were paid to SCP Management IV by Scott Brass Holding Corp., those fees did not benefit Sun Fund IV by reducing the Management Fees owed to its General Partner in those years.  Instead, the SCP Management IV fees generated management offset "carryforwards" for potential use in the years after SBI entered bankruptcy.

The Sun Funds contend that these "carryforwards" do not constitute a "direct economic benefit" because they did not offset any management fees during the time that SBI was partially owned by Sun Fund IV prior to its bankruptcy and because they represent only a "contingent" benefit to that fund during the years after.  For the reasons below, I believe that the Sun Funds' arguments offer too crabbed a view of the test articulated by the First Circuit.

1.   The "Carryforwards" Represent a "Benefit" to
     the Sun Funds

The first, and I believe most pertinent, fact to be addressed is whether Sun Fund IV obtained some benefit from the management activities undertaken by SCP Management IV acting under the direction of Sun Capital Advisors IV, LP, which is Sun Fund IV's agent and general partner.

The notes to Sun Fund IV's financial statements describe the Management Fee Offset carryforwards as follows:

> In accordance with the Partnership Agreement, the Management Fees that have otherwise not been irrevocably waived shall be reduced for certain other payments made to the General Partner as defined in the Partnership Agreement and upon the occurrence of certain future events also as defined in the Partnership Agreement, including a portion of the amounts paid to the General Partner or its affiliates for Directors Fees, Corporate Services Fees, management fees and Investment Banking Fees (the "Management Fee Offset"). As of December 21, 2008, the Management Fee Offset carryforward was $58,748,506.[6]

The $58,748,506, some portion of which is attributable to the management of Scott Brass, Inc., represents a potential reduction in the future payment of management fees. Although contingent on uncertain future events and although the economic value of the carryforwards may be something less than the reported dollar figure of $58,748,506 (in order to reflect the uncertainty of realization), the potential to reduce future management fees by $58 million is a valuable asset accruing to Sun Fund IV.

In its briefing, the Pension Fund has suggested that the carryforwards are akin to gift certificates--redeemable in the

---

[6] In their most recent supplement to their statement of facts, the Pension Fund has stated that as of December 31, 2013, the amount of the management fee offset carryforward for Sun Fund IV was $87,345,798. The Sun Funds have admitted the accuracy of this statement. Regardless, the precise magnitude of the carryforwards is irrelevant for present purposes.

future for reductions in Management Fees owed.  The Sun Funds convincingly explain that this is wrong; the carryforward cannot be used in the present and may turn out to be valueless in the future.  Given that explanation, the better analogy might be an out-of-the-money stock option or a lottery ticket.[7]  Although the carryforwards promise neither an immediate payment nor a sure one, they represent a valuable asset which one might rationally pay some amount for--though rationally less than the amount of the potential future payout as a discount for the uncertainty. This value accrues to the Sun Funds at the time these carryforwards are received--and not only upon the realization of the reduction in management fees--and so Sun Fund IV received a valuable benefit because of the management activities undertaken by SCP Management IV before Scott Brass, Inc.'s bankruptcy.

The Sun Funds argue that the carryforwards do not satisfy the First Circuit's test because they do not constitute a "direct economic benefit," suggesting that this should be measured by whether they have an "impact on the financial performance or position of the Funds in the periods in which

---

[7] The lottery ticket metaphor might be taken to suggest a low probability that the contingent benefit will be realized in the future.  But the relevant characteristic of the comparison is not the relative probabilities; it is rather that the future value of the item — either lottery ticket or carryforward — is not currently known with precision, but, despite this, the present ownership of the opportunity for future enrichment is itself of some value.

they accumulate."  In a similar vein, the Sun Funds suggest that carryforwards should be tested against the "constructive receipt" or "economic benefit" doctrines that relate to the recognition of income for taxes purposes. *See Reed* v. *Commissioner*, 723 F.2d 138, 142 and 147 n.6 (1st Cir. 1983) ("[U]nder the constructive receipt doctrine, a taxpayer recognizes taxable income when he has an unqualified, vested right to receive immediate payment"; "economic benefit requires the actual receipt of property or the actual receipt of a right to receive property in the future, at which point, the doctrine asks whether the property or the right confers a present economic benefit with an ascertainable fair market value.") (citations omitted).

I do not believe that the First Circuit intended that the trade or business determination on remand be guided either by the accounting conventions adopted by the Sun Funds or by tax rules relating to the timing of the receipt of income.  Although the First Circuit did use the terms "direct economic benefit" and "economic benefit," it did not do so consistently, as would suggest their use as terms of art.  Rather, the First Circuit variously described the offset of management fees as a "direct economic benefit," an "economic benefit," and simply as "a benefit." *See, e.g., Sun Capital*, 724 F.3d at 143, 148.  The question put to this court by the First Circuit was "whether Sun

15

Fund III received *any benefit* from an offset from fees paid by SBI." *Id.* at 148-49.  The First Circuit's opinion does not provide a basis for circumscribing the "investment plus" test such that it is satisfied by only those benefits which are functionally equivalent to immediately recognizable income.[8]

A less restricted test - evaluating whether the Sun Funds have received "any benefit" from the management of Scott Brass, Inc. - is also more consistent with the overall thrust of the First Circuit's opinion and the MPPAA.  The MPPAA predicates liability upon an entity's involvement in "trade or business" and the First Circuit's opinion makes a distinction between engaging in "trade or business" and "mere passive investment," the latter of which "defeat[s] pension liability."  *Id.* at 141. In determining whether an entity's receipt of benefits supports liability, the relevant distinction is not the kind or timing of the benefit, but between those benefits that "an ordinary,

---

[8] More generally, the First Circuit made clear in its opinion that it did not intend to provide a definitive and exclusive account of what type of activities might satisfy its "investment plus" test for purposes of § 1301(b)(1).  *See Sun Capital Partners III, LP* v. *New Eng. Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 141 (1st Cir. 2013).  Thus, I do not conclude that this test can be satisfied only by an economic benefit to the Sun Funds which is precisely identical to that found by the First Circuit.  Rather, the benefit received is one element that is incorporated as part of the First Circuit's "very fact-specific approach . . . tak[ing] into account a number of factors [and] cautioning that none is dispositive in and of itself."  *Id.*

16

passive investor" would receive and those resulting from the Sun Funds' "active involvement in management." *Id.* at 143. The benefit described here--carryforwards with the potential to offset future management fees owed by the Sun Funds--are not available to an ordinary passive investor who does not engage in management activities. Cf. *McDougall* v. *Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 577-78 (7th Cir. 2007) (losses consistent with purpose of trade or business).

Finally, I am guided to this conclusion by another consideration. The "investment plus" analysis and the question of whether the Sun Funds received benefits from management activities are tests aimed to shed light on whether an entity is engaged in "trade or business." The tests suggested by the Sun Funds would introduce into this analysis considerations that are wholly divorced from this fundamental underlying issue. Under the Sun Funds' test, whether the Funds received an "economic benefit" would depend entirely upon acts of separate entities, the Funds' General Partners, and upon their decisions whether or not to waive Management Fees. That, in fact, is precisely the case here--both Sun Funds III and Sun Funds IV engaged in identical activities. However, those activities generated benefits in different forms because of the different decisions made by their respective General Partners. Similarly, the test proposed by the Funds injects what appears to be a largely

17

arbitrary timing dimension into the "trade or business" determination.  If the bankruptcy had occurred later--during or after years in which Management Fees owed by the Funds were actually offset by the carryforward--but all other facts remained the same, the Sun Fund's test would be satisfied.  I will not adopt the proposed test which makes the receipt of an "economic benefit" contingent on factors that are either arbitrary or irrelevant to the ultimate determination that I must make--whether the Sun Funds were engaged in trade or business.

The generation of Management Fee offset carryforwards is a valuable benefit that accrues to the Sun Funds as a result of the Sun Funds' management activities relating to Scott Brass, Inc.  This is sufficient to satisfy the "investment plus" test articulated by the First Circuit.  Therefore, the "trade or business" test in § 130(b)(1) is satisfied as to both Sun Fund III and Sun Fund IV.[9]

---

[9]During the March 12, 2014 hearing, I speculated about the possibility that the Sun Funds might receive an economic benefit associated with the change in the timing of payments resulting from management fee waivers and offsets.  After analyzing the timing issue, the parties have agreed that no such benefit accrued to the Funds.

In addition, the Pension Fund, somewhat belatedly, has raised the possibility that the potential for the "Special Profits Interest Giveback" described in Section 9.4(e) of the Funds' LP Agreements could constitute an economic benefit and satisfy the First Circuit's "investment plus" test.  The Sun Funds have countered by asserting that, given Sun Fund IV's

## II. WHETHER SUN FUND III AND SUN FUND IV ARE UNDER "COMMON CONTROL" WITH SCOTT BRASS, INC.

I next turn to the question whether the Sun Funds were under "common control" with Scott Brass, Inc.  The Pension Benefit Guaranty Corporation has adopted regulations pertaining to the meaning of "common control."  See 29 C.F.R. §§ 4001.2, 4001.3(a).  The PBGC's regulations, in turn, employ the meaning of "common control" adopted under Section 414(c) of the Internal Revenue Code.  29 C.F.R. § 4001.3(a).  Under those regulations, two or more "trades or businesses" are under common control if they are members of a "parent-subsidiary" group of trades or businesses, a "brother-sister" group of trades or businesses or a "combined group" of trades or businesses.  26 C.F.R. § 1.414(c)-2.

A "parent-subsidiary group" - the relevant category here - means "means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if . . . controlling interest in each of the organizations, except the common parent organization, is owned . . . by one or more of the

_____

financial performance, there no longer is a possibility that this provision will come into play.  In light of my disposition of the "trade or business" question on another ground, and the lack of factual development related to the "Special Profits Interest Giveback" contention, I do not explore the effect of Section 9.4(e) of the LP Agreements.

other organizations; and [t]he common parent organization owns .
. . a controlling interest in at least one of the other
organizations.  26 C.F.R. § 1.414(c)-2(b).  A "controlling
interest" is defined to mean 80% ownership.  *Id.*

The application of these rules to the first links in the
organizational chain is uncontested.  When it withdrew from the
Pension Fund, Scott Brass, Inc. ownership was fully held by
Scott Brass Holding Corporation.  Scott Brass Holding
Corporation, in turn, was fully owned by Sun Scott Brass, LLC.
There is no argument that these entities would be considered to
be under common control with Scott Brass, Inc.  It is also
uncontested that considered separately, Sun Fund IV's ownership
stake in Sun Scott Brass, LLC is 70% and Sun Fund III's
ownership stake is 30%.  Both of these stakes separately fall
below the necessary 80% threshold necessary to establish a
"controlling interest" for purposes of MPPAA.  Thus, in the
absence of some mechanism by which the ownership interests of
Sun Funds III and IV would be aggregated, withdrawal liability
would not extend to the Plaintiff Funds themselves under these
rules.

The Pension Fund's contention is that (1) Sun Funds III and
IV formed a partnership or joint venture; (2) that the
partnership or joint venture was engaged in a trade or business;
and (3) that the partnership or joint venture is the ultimate

20

parent of a parent-subsidiary group which includes Scott Brass, Inc., the directly obligated entity.

## A.    *Statutory Background*

The "primary goal" of ERISA, and of the MPPAA in particular, is "protecting employees' benefits." *Pension Ben. Guar. Corp.* v. *Ouimet Corp.*, 711 F.2d 1085, 1092 (1st Cir. 1983). To further this purpose, Congress enacted section 1301(b), the common control provision, "in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Bd. of Trustees of W. Conference of Teamsters Pension Trust Fund* v. *H.F. Johnson Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987). *See also Mason & Dixon Tank Lines, Inc.* v. *Cent. States, Se. & Sw. Areas Pension Fund*, 852 F.2d 156, 159 (6th Cir. 1988) ("As the House and Senate Reports indicate, the primary purpose of the common control provision is to ensure that employers will not circumvent their ERISA and MPPAA obligations by operating through separate entities."); *UFCW Local One Pension Fund* v. *Enivel Properties, LLC*, 791 F.3d 369, 371 (2d Cir. 2015) ("To ensure the viability of multiemployer pension plans against the failure of a contributing employer, the MPPAA has broad provisions that disregard the usual legal barriers between affiliated, but legally distinct, businesses."). Liability is therefore not limited to the business entity that itself

21

withdrew from a multiemployer pension plan.  Rather, it "in effect[] pierces the corporate veil and disregards formal business structures."  *Sun Capital*, 724 F.3d at 138.  Indeed, other business organizations under common control can share in withdrawal liability even if there is no "economic nexus" between the various organizations.  *Cent. States, Se. & Sw. Areas Pension Fund* v. *Fulkerson*, 238 F.3d 891, 895 n.1 (7th Cir. 2001).  The requirement of "common control," as further defined in the regulations, both expresses disregard of organizational formalisms under the MPPAA and serves to limit the reach of withdrawal liability.

The regulations, in contrast, impose a "brightline" test for control based on ownership shares.  *Pension Ben. Guar. Corp.* v. *E. Dayton Tool & Die Co*., 14 F.3d 1122, 1126 (6th Cir. 1994).  Necessarily, these regulations assert an attention to organizational forms: in determining whether a particular organization is 80 percent owned by another, some reference to individual entities is required.  It is not quite fully resolved whether this brightline ownership-based test is *always* determinative of common control, *see id.* (addressing whether "actual control" is sometimes relevant instead), but the parties agree that it governs this dispute.

The use of a brightline ownership-based test is in some tension with the purposive approach of the MPPAA.  The statute

anticipates disregarding business entity formalities and preventing responsible parties from contracting around withdrawal liability.  As the First Circuit delicately stated, Congress "has not been explicit" in allowing investors in distressed companies to avoid ERISA withdrawal liability and "may prefer instead to rely on the usual pricing mechanism in the private market for assumption of risk." *Sun Capital*, 724 F.3d at 148.

In contrast, the 80 percent ownership rule appears to provide a roadmap for exactly how to contract around withdrawal liability.  In this case, for example, the Funds forthrightly admit that an important purpose in dividing ownership of portfolio companies between multiple funds is to keep ownership below 80 percent and avoid withdrawal liability. *Sun Capital*, 903 F. Supp.2d at 121.  This tension is only heightened when LLCs are employed.  The regulations look to ownership to determine control, but in LLCs (as with the LLCs used here) ownership can be divorced from effective managerial control. The statute requires that these regulations be "consistent and coextensive" with tax regulations, 29 U.S.C. § 1301(b), and arguably these tensions stem irremediably from differences between the goals of the MPPAA and the formalisms of the tax code.  The difficulties of applying the current scheme suggest that the relevant political actors should consider whether their

enactments can be better harmonized by statute and/or regulation.[10]

## B.    *The Relevance of the LLC*

Both parties agree that Sun Fund III and Sun Fund IV formed a jointly controlled business entity.  They disagree, however, about what form that jointly controlled entity has taken.  The Sun Funds contend that this joint entity is fully and exclusively embodied in the limited liability corporation formed for the very purpose of investing in Scott Brass, Inc., that is, Sun Scott Brass, LLC.  The Pension Fund, on the other hand, contends the record discloses the existence of a joint venture or partnership formed by the Sun Funds that is antecedent to the existence of Sun Scott Brass, LLC and sits above it in the Scott Brass ownership structure.  If such a joint venture or partnership existed, it would have complete ownership of Sun

---

[10] No doubt due to these tensions, some courts look to both ownership and managerial control, if not as a matter of doctrinal analysis then at least as an atmospheric factor. *See, e.g.*, *Plumbers & Steamfitters Local No. 150 Pension Fund* v. *Custom Mech. CSRA, LLC*, No. CV 107-142, 2009 WL 3294793, at *4 (S.D. Ga. Oct. 13, 2009) (noting that firms were "both exclusively owned and completely controlled" by same three entities and looking at management structure in addition to ownership structure to determine "common control"); *Cent. States, Se. & Sw. Areas Pension Fund* v. *Skyland Leasing Co.*, 691 F. Supp. 6, 11-12 (W.D. Mich. 1987) *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund* v. *Skyland Leasing*, 892 F.2d 1043 (6th Cir. 1990) ("In determining employer status, mechanical interpretation and application of the relevant provisions of the MPPAA must be avoided to ensure that the statutes' legislative purposes are achieved.").

Scott Brass, LLC, be commonly controlled with Scott Brass, Inc., and, if it is also a trade or business, pass withdrawal liability on to the Sun Funds as its partners.

The Sun Funds' preliminary argument is that the funds intentionally adopted the limited liability company form as the vehicle for their investment in Scott Brass, Inc. and this court should respect those organizational formalities as such. I find this argument insufficient. The MPPAA is a statute that allows for, and may in certain circumstances require, the disregard of such formalities. The question of organizational liability is not answered simply by resort to organizational forms, but must instead reflect the economic realities of the business entities created by the Sun Funds for their acquisition of Scott Brass, Inc.[11]

Moreover, the Funds' withdrawal liability is a matter of federal substantive law under ERISA and the state law of

---

[11] In a related theme, the Sun Funds argue that they cannot be held to have created a joint venture to acquire Scott Brass because they specifically intended instead to form a limited liability company, as demonstrated by the organizational documents of Sun Scott Brass, LLC and the LP Agreements. The relevant intent, however, must be something more than an intent to realize the benefits of a given organizational form. Put simply, an entity is not shielded from MPPAA withdrawal liability because it intended to be shielded from withdrawal liability. Rather, the inquiry must be whether the Sun Funds intentionally engaged in conduct which would support the existence of a partnership or joint venture that owns the Scott Brass business.

business organizations is relevant only for guidance and as incorporated into federal law.  *H.F. Johnson Inc*., 830 F.2d at 1014.  Thus, in the closely-related area of tax law, where the same regulations and definitions are at issue,[12] courts have been clear that the choice of organizational form under state law is not determinative of treatment under federal law.  Even where an express agreement is determinative under state law, "such an agreement is but one factor in determining whether a partnership exists for tax purposes."  *Estate of Kahn* v. *Commissioner*, 499 F.2d 1186, 1189 (2d Cir. 1974).  The many cases cited by Plaintiffs which suggest that certain organizational forms – whether LLCs or corporations – are per se incompatible with status as a partnership or joint venture all do so as a matter of state law and are not dispositive of the question of MPPAA withdrawal liability under federal law.[13]

---

[12] Of course, interpretations of tax provisions are not always applicable in the ERISA context, even for identical terms.  *Sun Capital*, 724 F.3d at 144–45.

[13] In my earlier opinion in this case, I discussed the applicability of state law "[i]n the absence of supervening federal authority."  *Sun Capital*, 903 F.Supp.2d at 119.  That discussion concerned the Funds liability as partners *apart* from statutory liability under the MPPAA, which had been addressed in a previous section.  When applying state law, I held that the Sun Funds were not responsible for the withdrawal liability of Sun Scott Brass, LLC.  *Id.*  Contrary to plaintiff's suggestion, this was not a "'common control' argument."  At the time, I wrote that "I do not reach, nor do I decide, the issue of 'common control'" under the MPPAA.  *Id.*

Not only the general purpose of the MPPAA but also the facts of this case support looking past the Sun Funds' choice to employ the LLC structure in assessing their withdrawal liability.  According to plaintiffs, Sun Scott Brass, LLC was a "passive holding company" for Scott Brass Holding Company.  It had no employees and did not own or lease offices or equipment. In contrast, the First Circuit found that the Sun Funds were "intimately involved in the management and operation" of Scott Brass.  *Sun Capital*, 724 F.3d at 142.  The LLC appears to be better understood as a vehicle for the coordination of the two Sun Funds – and an attempt to limit liability – than as a truly independent entity.  It is another layer in a complex organizational arrangement.  Under the MPPAA framework, which looks past the formal separation of entities, it is not clear why there should be any difference if the Sun Funds invest in Scott Brass, Inc. directly, invest through an intermediary holding company, or invest through both an intermediary holding company and an intermediary LLC.  *Cf. Sun Capital*, 724 F.3d at 148 ("The various arrangements and entities meant precisely to shield the Sun Funds from liability may be viewed as an attempt to divvy up operations to avoid ERISA obligations.").

A determination to aggregate ownership interests across formally separate business entities is strengthened by a comparison to Sun Fund III.  That Fund is actually two formally

separate entities - Sun Capital Partners III, LP and Sun Capital
Partners III QP, LP - which operate as "parallel funds."  The
two Sun Fund III parallel funds share a general partner and
invest together at a fixed proportion.  However, they have
different limited partners and filed separate partnership tax
returns. Both the Court of Appeals and I have treated these
parallel funds as "one fund" given their close connection and
general pattern of investing together in a fixed proportion.
Sun Capital, 724 F.3d at 134 n.3.  The plaintiff funds, without
conceding that parallel funds are under common control for MPPAA
purposes, have nevertheless proceeded to discuss their ownership
interests in those two parallel funds as aggregated in their
arguments.

That ownership interests sometimes can be aggregated across
parallel funds illustrates why, as a general proposition, they
sometimes can be aggregated across non-parallel funds.  All the
Sun Funds, whether parallel or not, were formally independent
entities with separate owners but ultimately made their
investment and business decisions under the direction of Leder
and Krouse.  The most important difference between parallel and
non-parallel funds is whether co-investments are made according
to a fixed or variable ratio: a distinction that is functional
rather than formal and, when dealing with joint ventures or
partnerships of limited scope, is highly fact-sensitive.  This

is not to say that all parallel funds are partnerships, much
less that all non-parallel funds are.  Rather, the comparison of
parallel and non-parallel funds reveals that the distinction
proves relatively little.  Organizational formalities do not
resolve the questions of joint operation that tax law emphasizes
in recognizing partnerships, whether those formalities delineate
separate parallel or non-parallel funds.  Consequently, I turn
to the substance of the Sun Funds' relationship with each other
and with Scott Brass to determine whether a partnership exists
under federal law.

## C.   *Federal Partnership Law*

Whether a partnership or joint venture exists in this
context between the Sun Funds is a matter of federal law.   The
Internal Revenue Code provides the relevant definition of a
partnership:

> The term "partnership" includes a syndicate, group, pool,
> joint venture, or other unincorporated organization,
> through or by means of which any business, financial
> operation, or venture is carried on, and which is not,
> within the meaning of this title, a trust or estate or a
> corporation; and the term 'partner' includes a member in
> such a syndicate, group, pool, joint venture, or
> organization.

26 U.S.C. § 7701(a)(2).  The Supreme Court has interpreted this
provision by providing a guide for how to determine the
existence of a partnership for tax (and MPPAA) purposes.

> A partnership is generally said to be created when persons
> join together their money, goods, labor, or skill for the

purpose of carrying on a trade, profession, or business and
when there is community of interest in the profits and
losses. When the existence of an alleged partnership
arrangement is challenged by outsiders, the question arises
whether the partners really and truly intended to join
together for the purpose of carrying on business and
sharing in the profits or losses or both. And their
intention in this respect is a question of fact, to be
determined from testimony disclosed by their agreement,
considered as a whole, and by their conduct in execution of
its provisions.

*Commissioner v. Tower*, 327 U.S. 280, 286-97 (1946).  Subsequent

cases have further elaborated the factors to which courts should

turn in determining the existence of a partnership.  In

*Commissioner* v. *Culbertson*, the Supreme Court identified whether

"the parties in good faith and acting with a business purpose

intended to join together in the present conduct of the

enterprise" as the ultimate inquiry and required factfinders to

look at "the agreement, the conduct of the parties in execution

of its provisions, their statements, the testimony of

disinterested persons, the relationship of the parties, their

respective abilities and capital contributions, the actual

control of income and the purposes for which it is used, and any

other facts throwing light on their true intent" in determining

that intent.  *Commissioner* v. *Culbertson*, 337 U.S. 733, 742

(1949).

The Tax Court has pointed to a long list of factors as

relevant in determining whether a partnership exists:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

*Luna* v. *Commissioner*, 42 T.C. 1067, 1077-78 (1964).

A joint venture is similar to a partnership, but is "generally established for a single business venture . . . while a partnership is formed to carry on a business for profit over a long period of time." *Podell* v. *Commissioner*, 55 T.C. 429, 432 (1970).  The *Luna* factors, and the ultimate inquiry into the parties' intent, is the same for joint ventures as for partnerships.  *Luna*, 42 T.C. at 1077.  Whether the Sun Funds formed what might be characterized as a joint venture with respect to Sun Brass or a partnership in which Sun Brass is one of several joint investments by the Funds is not material.  I will continue my analysis through the partnership lens for discussion purposes.

**D.   *Application of Partnership Factors***

Applying the above-mentioned factors, it is clear that no partnership-in-fact exists between the Sun Funds that covers all their activities and investments.  The Sun Funds are closely affiliated entities and part of the larger ecosystem of Sun Capital entities created and directed by Marc Leder and Rodger Krouse.  *Sun Capital*, 724 F.3d at 133.  Leder and Krouse, acting as the limited partner committees of the general partners of each Fund, retain substantial control over both Funds.  *Id.* at 134-35.  The Funds have identical language in their partnership agreements and are operated similarly. *Sun Capital,* 903 F.Supp.2d at 110.

Of course, individuals may create multiple businesses, using the same strategy, without necessarily putting all their enterprises into partnership with each other.  And looking superficially, there is nothing that evidences an intent that Sun Fund III and IV be joined together as a general rule.  The Funds filed partnership tax returns and filed them separately.  Sun Fund III and Sun Fund IV have separate financial statements, separate reports to their partners, separate bank accounts, largely non-overlapping sets of limited partners, and largely non-overlapping portfolios of companies in which they have invested.  When they co-invested, as in Sun Scott Brass, LLC, their agreements disclaimed any intent to form a partnership or

joint venture.  The conventional theories of a general partnership – those that on the face reflect operational and institutional overlap between the Funds – are not evident here.

A more limited partnership or joint venture, however, is nevertheless to be found, based on the present record.  The Sun Funds are not passive investors in Sun Scott Brass, LLC, brought together by happenstance, or coincidence.  Rather, the Funds created Sun Scott Brass, LLC in order to invest in Scott Brass, Inc.  Between 2005 and 2008, Sun Funds III and Sun Funds IV also coinvested in five other companies, using the same organizational structure.  In each case, they expressly disclaimed any intent to form a partnership or joint venture, a fact that remains relevant — but not dispositive — as to whether a partnership-in—fact was created.  More importantly, prior to entity formation and purchase, joint activity took place in order for the two Funds to decide to coinvest, and that activity was plainly intended to constitute a partnership-in-fact.

In its opinion in this case, the First Circuit observed that "It is the purpose of the Sun Funds to seek out potential portfolio companies that are in need of extensive intervention with respect to their management and operations," and that in this connection "[i]n 2006, the Sun Funds began to take steps to invest in SBI." *Sun Capital*, 724 F.3d at 142.  I do not suggest that the court's description of the Sun Fund III and Sun Fund IV

acting in concert as the "Sun Funds" in itself represents a prior judicial finding that a partnership existed.  But the court's opinion shows how difficult it can be to speak sensibly of the business model of Sun Fund III and Sun Fund IV without describing them as acting together or in concert with respect to specific investments.  The period of joint action evident in the First Circuit's observation covers at least the period before the Funds completed the acquisition of a portfolio company through an LLC and holding company and would appear to extend through the operation of those LLCs and portfolio companies.

Notably, the Funds made a conscious decision to split their ownership stake 70/30 for reasons that demonstrate the existence of a partnership.  The Funds assert three motivations for this split: that Sun Fund III was nearing the end of its investment cycle while Sun Fund IV was earlier in its own cycle, a preference for income diversification, and a desire to keep each Fund below 80 percent ownership to avoid withdrawal liability.  With the exception of income diversification, which two truly independent entities could also pursue in parallel but on their own, these goals are instinct with coordination and show joint action.  The record shows that the 70/30 split does not stem from two independent funds choosing, each for its own reasons, to invest at a certain level.  Rather, these goals stem from top-down decisions to allocate responsibilities jointly.

34

Entities set up with rolling and overlapping lifecycles and coordination during periods of transition offer advantages to the Sun Funds group as a whole, not just to each Fund.  And the choice to organize Sun Scott Brass, LLC, so as to permit each of the Sun Funds coinvesting to remain under 80 percent ownership, is likewise a choice that shows an identity of interest and unity of decisionmaking between the Funds rather than independence and mere incidental contractual coordination.  A separate entity which is perhaps best described as a partnership-in-fact chose to establish this ownership structure and did so to benefit the plaintiff Sun Funds jointly.

The two Funds were organizationally separate – and this remains important under *Culbertson* and *Luna* – but the record shows no meaningful evidence of actual independence in their relevant co-investments.  The Funds have not indicated, for example, that they sometimes co-invested with each other but sometimes co-invested with other outside entities.  Neither has evidence been adduced of disagreement between Sun Fund III and Sun Fund IV over how to operate the LLC, as might be expected from independent members actively managing and restructuring an industrial concern.  The smooth coordination is indicative of a partnership-in-fact sitting atop the LLC: a site of joining together and forming a community of interest.

Given the record before me, no reasonable trier of fact could find that the Sun Funds' joint operation of Scott Brass was carried out solely through their LLC or that their relationship was defined entirely by the agreements governing the LLC.  The record is not clear on the precise scope of their partnership or joint venture – which portfolio companies were covered, the date on which the relevant partnership or joint venture was formed, and so forth – but it is clear beyond peradventure that a partnership-in-fact existed sufficient to aggregate the Funds' interests and place them under common control with Scott Brass, Inc.

The only other court to address "common control" in a similar organizational structure found the structure to be compatible with a partnership for MPPAA purposes. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund* v. *Palladium Equity Partners, LLC*, 722 F. Supp. 2d 854 (E.D. Mich. 2010).  To be sure, the *Palladium* court believed it required additional factfinding before it could reach a determination on the partnership issue, and the case settled before that factfinding could be completed, but a comparison to that case is instructive in understanding the legal framework to be employed.

In *Palladium*, a plaintiff pension fund sued three private equity funds over withdrawal liability under the MPPAA.  The private equity funds, with disclaimers of any intent to form a

partnership, had invested in a group of industrial painting companies that had gone bankrupt and withdrawn from a multi-employer pension plan. *Id.* at 857.  Together these three Palladium funds owned well over 80 percent of the bankrupt companies – enough for common control – but none individually owned more than 57 percent. *Id.* at 859.  The court held that it could not determine whether the three funds were a joint venture or partnership as a matter of law and denied cross-motions for summary judgment. *Id.* at 867, 875.

There are many similarities between the Palladium funds and the Sun Funds, although the Palladium structure is at all points somewhat less complex.  And put simply, the Palladium Funds observed most of the same organizational formalisms as the Sun Funds.  But this was not enough to keep them from being a partnership under the statute.  The Palladium court was clear that as a matter of law, partnership-in-fact and common control can be found even across formally fully independent entities.[14]

---

[14]    The Sun Funds contend that the Palladium facts presented stronger evidence for partnership than exists here and identify two important distinctions between this case and that one.  I find neither distinction sufficient for the plaintiffs here to overcome summary judgment.
    First, unlike the Sun Funds, the Palladium funds invested directly in the portfolio companies through the purchase of stock.  They did not form an LLC in which they were members.  I do not find this distinction of any great importance in the context of the MPPAA: it is the substance of the Funds' activities, not the number of entities they placed between

In this case, the record clearly shows the Sun Funds, despite the lack of a permanently fixed co-investment ratio, joining together as a partnership to invest in and manage certain of their shared portfolio companies, in particular Scott Brass, Inc.  I conclude the plaintiffs are under common control with Scott Brass, Inc.

### E.    Is the Partnership a Trade or Business?

Even where a partnership is recognized, it is not responsible for withdrawal liability unless it is a "trade or business." *Sun Capital*, 724 F.3d at 138.  Whether an entity is a trade or business is a "very fact-specific" inquiry without

---

themselves and the actual employees covered by unfunded pensions, that determines whether a partnership existed.

Second, the Palladium Funds were operated as "parallel funds."  The limited partnership agreement of their shared General Partner stated that the funds were to invest proportionately in their investments.  The Palladium Funds in essence provided the same investments to different investors. In contrast, Sun Fund III and Sun Fund IV were not parallel funds.  Of the 43 LLCs in which Sun Fund III held an interest and the 52 LLCs in which Sun Fund IV did, only seven overlapped. There is no indication that those seven investments were made in fixed proportion.  Clearly, Sun Fund III and Sun Fund IV operated more independently than parallel funds, including the funds in Palladium, and had they been operated as parallel funds, it would surely have further strengthened any finding of partnership.

But whether funds are parallel or not does not necessarily determine whether they are a partnership, though it might frequently prove relevant.  While acting in parallel could be one way for private equity funds to form a partnership, it is not the only way.  This is particularly true for partnerships or joint ventures with limited purposes; two funds which were operated separately could operate jointly for a period of time or with regard to a particular set of investments.

any single dispositive factor.  *Id*. at 141.  Given the
substantial overlap between the features of the Sun Funds which
the First Circuit found to make them trades or businesses and
the activities of what I find to be the partnership-in-fact
between them, I find their partnership-in-fact to be a trade or
business as a matter of law as well.

The Pension Fund points to the acts of the two Sun Funds as
constituting the nature of the partnership, in the manner of
DNA.  But it is well-settled that whether a partnership is a
"trade or business" must be resolved at the partnership level,
not by looking at the partners.  *See Brannen* v. *Commissioner,*
722 F.2d 695, 703 (11th Cir. 1984) (citing *Madison Gas &*
*Electric Co*. v. *Commissioner*, 72 T.C. 521 (1974), *aff'd*, 633
F.2d 512 (7th Cir. 1980) and *Goodwin* v. *Commissioner*, 75 T.C.
424 (1980), *aff'd without published opinion*, 691 F.2d 490 (3d
Cir. 1982)).  Determining whether the partnership is a trade or
business requires distinguishing between acts taken by the
partnership and those taken by the partners acting alone.

For their part, the Sun Funds argue that the partnership
could not be a trade or business because it would merely be a
passive investor, the only purpose of which was to hold the
Funds' investment in an LLC.  They claim that because the Sun
Funds were found to have been actively managing their portfolio
companies – because they were trades or businesses – there was

no active work left for the partnership to do.  This argument,
too, misunderstands the nature of the partnership.  A
partnership exists because the Sun Funds carried on their
individual trades and businesses together, as a factual matter.
I did not recognize the existence of a partnership between the
Sun Funds because, as the plaintiffs suggest, the Funds created
a partnership "solely to enable the TPF to hold the Sun Funds
liable and nothing more than that."  In the absence of an
express partnership agreement, it is the conduct of the Funds
that gives rise to a partnership, and it is that conduct which
shows the purposes of the partnership itself.  A partnership is
not the sum of all its partners' actions, as the Pension Fund
would have it, but it is also not an empty box excluding all the
acts of its partners, as the Sun Funds suggest.  Whether a
partnership is a trade or business is a finer-grained and more
fact-specific inquiry than either party suggests.

It is clear from the undisputed facts that the plaintiffs'
partnership-in-fact here is a trade or business under the First
Circuit's analysis.  Like the Sun Funds, the partnership's
purpose is to make a profit, an important factor in determining
"trade or business" status, although an insufficient one.  *Sun
Capital*, 724 F.3d at 141-42.  Additionally, the partnership was
involved in the active management of the portfolio companies
that the First Circuit found critical.  For example, the First

Circuit found it important that the Sun Funds' purpose is "to seek out potential portfolio companies that are in need of extensive intervention" and that "restructuring and operating plans are developed for a target portfolio company even before it is acquired." *Id.* at 142. This period of joint investigation and action prior to the formation of an LLC is central to the work of the partnership itself – it is an important piece of why I find a partnership-in-fact to exist – and so is highly indicative of that partnership being a trade or business. Likewise, the First Circuit noted that "the Sun Funds were able to place employees of Sun Capital Advisors, Inc. in two of the three director positions at Scott Brass, Inc., resulting in Sun Capital Advisors employees controlling the SBI board." *Id.* at 143. This indicates a joint effort to control Scott Brass, Inc., through Sun Capital Advisors, rather than independent efforts to exert control through, for example, one seat on the board for each Fund.

It is of course true, as the plaintiffs insist, that the partnership received no "direct economic benefit" on top of the benefits received by the Sun Funds. Since the partnership was not a formally constituted entity, it could not have done so. But this proves too much. It would suggest that no partnership recognized from actions rather than express agreements could be a trade or business, a conclusion at odds with the substantial

41

body of law finding precisely such partnerships to be trades and businesses. *See, e.g., Connors* v. *Ryan's Coal Co.,* 923 F.2d 1461, 1467 (11th Cir. 1991). The "direct economic benefit" factor addresses not whether the partnership itself retained the benefits of its activities, as opposed to passing them along to its partners, but rather whether its activities were intended to generate compensation that "an ordinary, passive investor would not derive." *Sun Capital*, 724 F.3d at 143. The partnership's active management in pursuit of profits from restructuring was not mere passive investment but something more. For precisely the same reasons as the Sun Funds are trades or businesses, the partnership or joint venture formed between them is so as well.

Because the plaintiffs' partnership-in-fact is a trade or business and is in common control with Scott Brass, Inc., it is responsible for the withdrawal liability. As a result, the plaintiff Sun Funds are jointly and severally responsible for that liability as well.

### III. CONCLUSION

For the reasons set forth more fully above, Plaintiffs' Renewed Motion for Summary Judgment, Dkt. No. 130, is DENIED, Defendant's Motion for Summary Judgment, Dkt. No. 82, is

RECONSIDERED and now GRANTED, and the Clerk is directed to enter judgment for the Defendants.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

# APPENDIX A

